91 N.J. Super. 527 (1966)
221 A.2d 559
JEROME A. SCHNEIR, D.O., PLAINTIFF,
v.
THE ENGLEWOOD HOSPITAL ASSOCIATION, ET AL. DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided May 17, 1966.
*528 Mr. Herbert New for the plaintiff (Messrs. Brenner & New, attorneys).
Mr. Abram A. Lebson for the defendant (Messrs. Lebson & Prigoff, attorneys).
SCHNEIDER, J.C.C. (temporarily assigned).
On motion, suit was dismissed as to all defendants except the Englewood Hospital Association. Plaintiff is a Doctor of Osteopathy and filed an application seeking membership on the courtesy medical staff of the Englewood Hospital. He files suit to compel defendant to consider his application in good faith, reasonable and for the public good. The Englewood Hospital Association is a nonprofit corporation operating a hospital in Englewood, Bergen County, New Jersey.
The facts appear to be as follows: Plaintiff graduated Alfred University with a B.A. degree. He attended the Kirksville College of Osteopathy at Kirksville, Missouri, for four years, which college is approved by New Jersey, and received the degree of D.O. The course was a full medical program and he graduated May 30, 1960. He was 41 in standing in a class of 65 students and had a C-plus average. He interned at Normandy Osteopathic Hospital for a one-year rotating internship.
He took board examinations in Missouri and Kentucky and was licensed to practice medicine and surgery July 9, 1960 in Missouri. In Kentucky he was licensed to practice osteopathy on July 1, 1961, but he never practiced there. He received a license to practice in New Jersey on July 12, 1961 and his certificate showed it was based on reciprocity with Missouri. He was licensed in New York based upon reciprocity under his Kentucky license. He has never practiced in New York.
*529 Plaintiff took an examination and was licensed in California for the practice of osteopathy on May 28, 1964. Under California law, medicine and osteopathy were amalgamated and he can practice medicine there but never has. By a quirk of law, he received an M.D. degree from the California College of Medicine, a recognized medical school, although he never attended that medical school.
He opened an office for the practice of medicine in January 1962 in Fort Lee, Bergen County, New Jersey. He is a member of the Bergen County Association of Osteopathic Physicians and the New Jersey Society of Osteopaths. He never applied for membership in the Bergen County Medical Society. He conducts a general practice of medicine.
In March 1964 he opened an office for the practice of medicine in Edgewater, New Jersey, and since the death of a doctor there, has been the only doctor with an office in that community. He serves a number of industrial plants, with a total working force of 800, on an emergency basis, but with one exception other doctors are called in from time to time.
Plaintiff is on the medical staff of River Dell Hospital in Oradell, New Jersey. It is an osteopathic hospital with 60 beds. He was also on the medical staff of Saddle Brook Hospital at Saddle Brook, New Jersey, which has 100 beds, but he resigned voluntarily because he did not wish to pay the charge of $25 per month. At River Dell Hospital the doctors were required to pay the hospital 25% of the fee received from the patient, but now payment is required only on surgical cases and he pays dues of $20 per month.
Defendant Englewood Hospital is about four miles from plaintiff's office and it takes 10-15 minutes to get there. The distance and time are the same from Edgewater. River Dell is 12-15 miles away and it takes one-half hour to get there. Holy Name Hospital in Teaneck is about the same distance and time as Englewood Hospital, as are Hasbrouck Heights Hospital and Saddle Brook. North Hudson Hospital in West New York is about four miles away, and there is Christ Hospital in Jersey City.
*530 Plaintiff contends River Dell Hospital is not sufficient for the needs of his patients and there are not enough beds for emergency cases. Some patients insist on going to Englewood Hospital and plaintiff cannot treat them there. He claims loss of patients by that situation. His patients come from the area of Fort Lee, Edgewater and surrounding towns.
The Englewood Hospital covers about 23 communities, including Fort Lee and Edgewater. While this is a private hospital it gets its money from contributions from the citizens in the area. It receives funds from the County government, federal grants for construction, and community chest funds.
The plaintiff made an application for the courtesy staff of the Englewood Hospital. He was informed he was not eligible because he was not a member of the Bergen County Medical Society. When our courts found such requirement to be improper, a second application was filed on August 23, 1963. This application made no mention of the Edgewater office or the practice there. Plaintiff supplied written references from two doctors and showed he was on the staff of River Dell and Saddle Brook Hospitals. The application showed he had no formal post-graduate education. The first application showed his M.D. from California, but this was not set forth in the second application.
On January 27, 1964 the hospital sent a letter to plaintiff, stating:
"At a meeting of the Executive Committee of the Board of Trustees on January 21, 1964 the recommendations of the Credentials Committee, were presented. The Executive Committee reviewed in detail the investigation by the Credentials Committee of your qualifications and approved its recommendation that action on your appointment be deferred at the present time. Your application is being held by the Credentials Committee for further consideration at a later date.
It is noted from the information in your application that you have hospital privileges for the care of your patients in two other hospitals in Bergen County, pending further consideration of your application."
Plaintiff filed suit a few months later, in May 1964. On March 16, 1964 the hospital wrote to plaintiff's attorney *531 stating that the hospital has had many applications pending for some time, and some appointments have been made. It also pointed out that the hospital was being reconstructed; that there was a shortage of hospital beds, and this would be so until 1965. It offered to give consideration to plaintiff at a later date and explained that the present staff does not have the facilities it needs.
Plaintiff has listed the names of doctors who had been accepted on the staff at Englewood Hospital since his application. It developed that these doctors had medical specialties, had served residencies; and most had passed board examinations in their specialties; they had had considerable post-graduate work, had waited some time before being accepted, and had practiced for much longer periods of time than plaintiff. Their specialties were in great need.
Another osteopath testified as to plaintiff's qualifications. The two doctors who had written the letters accompanying plaintiff's application did not appear to testify at the trial. They were available but have been appointed to the staff at Englewood Hospital. One letter made reservations as to plaintiff's qualifications, and the second was from a friend and was favorable to plaintiff.
The testimony produced by the hospital showed there were 260 adult beds at the time of the application in 1963 which had increased by July 1964. In 1963 there were 301 doctors on the staff; today there are 317 for 374 adult beds. There is a waiting list of 100-200 patients for beds, and present staff members cannot get beds for many of their patients.
The hospital contends that plaintiff's application had received full consideration and that the same procedure had been used as in all applications. The application was first sent to the executive director, who investigated the applicant and confirmed his record. It was then sent to the chief of the medical section, Dr. Barlow, hospital chief of staff. The hospital had a bylaw that the applicant had to be in practice one year, but it had followed a policy of requiring two years in practice. Applicant had only practiced one year and two *532 months. He took into consideration his medical school record and other information. He wrote a report and found the applicant to be well recommended, but felt the matter should be held for one year and reviewed at that time when plaintiff had been in practice two years. He was of the opinion that plaintiff deserved consideration for appointment.
The application then went to the hospital credentials committee, headed by Dr. Follette, who testified that the committee had given the application full consideration and had recommended delay in order to see the type of medicine practiced by the applicant.
There are no osteopaths in this hospital. Applications deferred are reconsidered each year, but since this litigation had started, plaintiff's application had not been reviewed. The credentials committee had checked the record, the M.D. degree from California without attendance, his standing in his class and his lack of post-graduate training; it considered the lack of beds and the needs of the hospital, but knew very little about the medical work being done by applicant. It also took into consideration the availability of two hospitals to applicant and wanted delay in passing on the applicant. There was a crying need for certain specialties at the time.
Dr. Barlow testified he was chief of staff and he had waited three years after starting practice before he was admitted.
The application then went to the executive committee of the board of trustees and then to the entire board.
The chief complaint of plaintiff and counsel was not the denial of appointment but that the reasons expressed in court had never been told to the plaintiff.
Plaintiff's counsel contends that plaintiff was not appointed because he was an osteopath and that the deferment of acceptance or rejection was to circumvent the present law.
In Greisman v. Newcomb Hospital, 40 N.J. 389 (1963), the Supreme Court came to the aid of an osteopath. He was the only licensed physician in his community, a plant and school physician, and applied for courtesy privileges to the only hospital in Vineland area. The hospital was run very *533 much as the Englewood Hospital and received its funds in the same way. It refused to permit Dr. Greisman to file an application, but did not question his qualifications. The refusal was based on his failure to be a member of the county medical society and a graduate of a college approved by the American Medical Association.
The court found that the hospital was not a private one because of its monopoly in the area in which it functioned, and that it could be regulated for the common good. The court referred to the case of Falcone v. Middlesex Co. Medical Society, 34 N.J. 582 (1961), which struck down an arbitrary membership requirement of a nonprofit organization engaged in an activity of public concern and compelled admittance into the medical society. The Greisman case extended the doctrine to hospitals, to provide that the power to pass on staff membership applications is a fiduciary power and the applicant is entitled to have his application evaluated on its own individual merits.
Justice Jacobs went on to say:
"It must be borne in mind that we are not asked to pass on a discretionary exercise of judgment but only on the validity of the bylaw requirement. Therefore, we need not concern ourselves with any of the larger issues relating to discretionary limits or the general lengths to which a hospital may go in conditioning staff admissions on the approval of outside bodies * * *.
Hospital officials are properly vested with large measures of managing discretion and to the extent that they exert their efforts toward the elevation of hospital standards and higher medical care, they will receive broad judicial support. But they must never lose sight of the fact that the hospitals are operated not for private ends but for the benefit of the public, and that their existence is for the purpose of faithfully furnishing facilities for the members of the medical profession in aid of their service to the public. They must recognize that their powers, particularly those relating to the selection of staff members, are powers in trust which are always to be dealt with as such. While reasonable and constructive exercises of judgment should be honored, Courts would indeed be remiss if they declined to intervene. * * *"
This court finds that defendant gave full consideration to the application. There is no question that the osteopath *534 still has a hard task to gain acceptance, but the facts here are not the same as in Falcone and Greisman. The application went through the regular procedure of all applications and was never rejected. The applicant had two hospital connections which are not of the best but do aid him for the time being while he develops his reputation as a good doctor.
There were considerable questions as to plaintiff's qualifications. It is not necessary to pass on them but only to determine that they were fairly considered. The evidence shows a shortage of beds and many doctors waiting for courtesy privileges. Doctors already accepted are having difficulty in obtaining beds for their patients.
This case seems to be one of a "young man in a hurry." There is no evidence of discrimination; rather there is evidence of that consideration by the hospital authorities which Justice Jacobs stated would receive "broad judicial support."
This decision cannot be construed as giving hospitals the right to exclude osteopaths from their staff. They are licensed by the State and must be given full consideration, and the courts will protect their rights. As was stated recently in 15 Rutgers L. Rev. 322 (1961), in reviewing the Falcone case, courts should put labels aside and reach particular facts. "What kind of medicine does the plaintiff practice? Not, what is he called?"
Nor does this decision bar this plaintiff from applying again or seeking admission under his present application in the future.
Judgment for defendant. No costs.