STATE OF TENNESSEE ex rel. GEORGE O. CARPENTER, D.O., Appellee, v. WAYNE A. COX et al., Appellants.—453 S.W.2d 69.

Western Section. March 20, 1969.

Certiorari Denied by Supreme Court August 27, 1969.

Hugh K. McLean, Richard L. Dunlap, Jr., Paris, Charles L. Cornelius, Jr., Nashville, for appellants.

Hal Holmes, Thomas E. Harwood, Trenton, for appellee.

CARNEY, P. J. (W.S.). The relator, George O. Carpenter, a Doctor of Osteopathy, living in Paris, Tennessee, brought this suit against the Board of Trustees of the Henry County, Tennessee, General Hospital seeking admission as a member of the Medical Staff of the hospital. All of the trustees of the hospital were named as parties defendant. The members of the Medical Staff of the hospital were allowed to intervene as parties defendant to resist the efforts of the relator. Since Chancellor Wayne A. Cox was president of the Board of Trustees, he recused himself as Chancellor and Chancellor Brooks McLemore of Jackson, Tennessee, sat by interchange.

Chancellor McLemore refused to order the relator, George O. Carpenter, admitted as a member of the Medical Staff for the reason that ''the Court would be in the position of having passed on a discretionary exer-

cise by the Board of Trustees without actually having before the Court the exact evidence which was presented to the Board of Trustees.'' However, Chancellor Mc-Lemore found that the fact that the relator, George O. Carpenter, ''was not licensed as an M.D played a large part in the decision to deny him medical privileges in the hospital.'' The Chancellor held invalid a provision in the by-laws of the Medical Staff of the hospital which the trustees and staff construed to require an applicant to have an M.D. degree from a medical school approved by the American Medical Association. The Chancellor held that such provision was contrary to the public policy of the State of Tennessee and that at least one of the standards used by the Board of Trustees in passing upon Dr. Carpenter's application was illegal.

The Chancellor then held that the relator, George O. Carpenter, was entitled to have the Board of Trustees consider his application for membership on the Medical Staff in accordance with the remaining valid by-laws. He entered an order requiring the Board of Trustees to review petitioner's application ''consistent with this memorandum within 60 days from the date of the entry of the decree.'' The decree was entered. The Board of Trustees and the Medical Staff were granted discretionary appeals to this court where they have assigned error.

On January 6, 1960, apparently on a blank furnished by the hospital, the relator, Dr. George Carpenter, filed written application for appointment to the Medical Staff of the Henry County General Hospital. This written application showed the place and date of birth of the relator to be Townville, Pennsylvania, May 14, 1917, that he was a graduate of the Kirksville College of Osteopathy and Surgery of Kirksville, Missouri, and that

he served a clerkship at Kirksville Osteopathic Hospital in Kirksville, Missouri, from June 15, 1956, to June 15, 1957; that he was a member of the American Osteopathic Association and the Tennessee Association of Osteopathic Physicians and Surgeons and that he was a member of the Medical Staff of the Chesemore Hospital (Private) of Paris, Tennessee. Relator listed as references a number of residents of Kirksville, Missouri, including three officials of the Kirksville Hospital and School. In addition, he attached a copy of his license to practice osteopathy issued by the State of Tennessee along with a copy of his diploma from the Kirksville College.

The application was denied, after which Dr. Carpenter retained an attorney. On October 26, 1964, Dr. Carpenter's attorney received the following letter from the attorney for the Board of Trustees:

"October 26, 1964

Mr. Thomas E. Harwood
Attorney at Law
115 West Court Square
Trenton, Tennessee

Re: Dr. George Carpenter

Dear Mr. Harwood:

Since my letter to you of September 26, 1964, I have had an opportunity to discuss this matter at some length with the proper authorities.

I am informed that Dr. Carpenter was notified of the position of the hospital authorities in 1961, as a result of his having made application for professional privileges at that time. It is the present position of the

hospital authorities that there has been no change in the qualifications of Dr. Carpenter since the prior decision was made and therefore there is no justification for a change in the position of the hospital.

Yours very truly,
Hugh K. McLean

HKM:nfv"

On March 19, 1965, the relator brought this suit averring that the action of the Board of Trustees in denying him the right to be admitted as a member of the Medical Staff was arbitrary, unreasonable and illegal and deprived him and his patients of their constitutional rights, especially as set out in Article I, Section 8 and Article I, Section 21, of the Constitution of the State of Tennessee. These sections are:

"Section 8. No man to be disturbed but by law.—That no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

"Sec. 21. No man's services or property taken without consent or compensation.—That no man's particular services shall be demanded, or property taken, or applied to public use, without the consent of his representatives, or without just compensation being made therefor."

The Trustees and the members of the Medical Staff testified that they did in fact make investigation concerning the ability of the relator, George O. Carpenter, to practice medicine and surgery in the Town of Paris and

they did look into the question of his fitness to become a member of the Medical Staff and that they found that his medical services and abilities were substandard and for that reason decline his application for appointment to the staff. They denied that they rejected his application solely because he was not an M.D. We concur in the finding of the Chancellor that the preponderance of the evidence is that the by-law adopted by the Medical Staff that no physician should be appointed to the Medical Staff unless he had an M.D. degree from a medical school approved by the American Medical Association played a large part in the Board's consideration of Dr. Carpenter's application. If the by-law is in fact violative of the relator's constitutional rights, then necessarily the action of the Board in considering said by-law in determining relator's application for appointment to the Medical Staff was illegal and the Chancellor's decree was correct.

The Henry County General Hospital was authorized by Chapter 176 of the Private Acts of 1953, State of Tennessee. The Act does not set out any limitations, restrictions, or definition of those who are to practice the healing arts within the hospital except the general term "staff physicians" is used. Our Tennessee Legislature in T.C.A. Section 53-1301, creating a Hospital Board, etc., has defined the word "physician" as follows:

"(g) 'Physician' means a graduate of an accredited medical school authorized to confer upon graduates the degree of doctor of medicine (M.D.), who is duly licensed in Tennessee, or an osteopathic physician who is a graduate of a recognized osteopathic college authorized to confer the degree of doctor of osteopathic

(D.O.) and who is licensed to practice osteopathic medicine in Tennessee.''

The by-law complained of contained the term ''* * * graduate of an approved medical school * * *'' but all the parties and the Chancellor interpreted the phrase ''approved medical school'' as meaning a school approved by the American Medical Association.

Under the new Medicare Act as passed by Congress the term ''physician'' covers both Doctors of Medicine and Osteopathy. U.S. Code Ann. Vol. 42, Section 1395x, sub-paragraph (r), (Medicare Act).

A review of some of the statutes of Tennessee relating to the practice of the various branches of the healing arts will be helpful. The practice of medicine and surgery in the State of Tennessee is regulated by T.C.A. Sections 63-601 through 63-621. T.C.A. Section 63-608 defines the practice of medicine as follows:

''63-608. 'Practice of medicine' defined.—Any person shall be regarded as practicing medicine within the meaning of this chapter who shall treat, or profess to treat, operate on, or prescribe for any physical ailment or any physical injury to or deformity of another; provided, that nothing in this section shall be construed to apply to the administration of domestic or family remedies in cases of emergency, or to the laws regulating the practice of dentistry; and this chapter shall not apply to surgeons of the United States army, navy, air force, or marine hospital service, or to any registered physician or surgeon of other states when called in consultation by a registered physician of this state, or to midwives, or to veterinary surgeons, or to osteopaths, or chiropractors not giving

or using medicine in their practice, or to opticians, optometrists, chiropodists or to Christian Scientists.''

In the case of Ison v. McFall, 1964, 55 Tenn.App. 326, 400 S.W.2d 243, this court construed Section 63-608 to mean that the field of doctors of medicine covers all human illnesses and diseases and their diagnosis, treatment and prevention. T.C.A. Section 63-611 sets out the minimum requirements of an applicant for a license to practice medicine or surgery in Tennessee and we quote said section as follows:

''63-611. Application for certificate.—Persons desiring to obtain a certificate to practice medicine or surgery in this state shall make application in writing to said board, which application shall be accompanied by a certificate issued by the board of examiners in the basic sciences, and a certificate from a medical school whose curriculum is as high as that of the medical department of the University of Tennessee, as published at the time of its catalogue, and by examination fees hereinafter prescribed and by satisfactory proof that the applicant is of good moral character. The board shall be the sole judge as to whether or not the applicant holds a certificate from a medical school with the required curriculum. The applicant shall present himself before the board for examination upon the following branches, viz.: surgery, obstetrics, materia medica and therapeutics, practice and physical diagnosis, gynecology and hygiene.

The members of the board shall also have the right to examine all applicants in such oral examinations as they may deem necessary.''

The practice of osteopathy in Tennessee is regulated by T.C.A. Section 63-901 through 63-912. There are no osteopathic colleges in the State of Tennessee. The minimum requirements for an applicant to be admitted to practice osteopathy are contained in Section 63-904 through 63-907 which we copy as follows:

"63-904. Application for certificate to practice.—Before engaging in the practice of osteopathy, every person shall have made to the secretary of the board application for a certificate of fitness to practice osteopathy, on a form to be prescribed by the board, giving first, his name, age (which shall be not less than twenty-one (21) years), and residence; second, the name of the school of osteopathy from which he was graduated, which shall have been in good repute as such at the time of the issuing of his diploma, as determined by the board; third, the date of his diploma, evidence that such diploma was granted on personal attendance and completion of the course of study of not less than four (4) terms of not less than nine (9) months in a year for four (4) separate years; and such other information as the board may require, and sufficient evidence that the applicant is of good moral character. Each applicant shall at or before the time of making such application pay to the treasurer of the board a fee of fifty dollars ($50.00); and each applicant for a license by reciprocity shall pay a like sum of fifty dollars ($50.00).

63-905. Educational requirements.—All applicants for a certificate of fitness to practice osteopathy shall have completed two (2) years of college education, of college grade, in a recognized college or university, prior to enrolling in an osteopathic college.

63-906. Examination of applicants—Reciprocity.—
The board shall subject all applicants to an examination in the subjects of anatomy, chemistry, physiology, pathology, bacteriology, preventive medicine, diagnosis, toxicology, pharmacology, therapeutics, surgery, gynecology, obstetrics, medical jurisprudence, practice of osteopathic medicine, and such other subjects as the board may require; provided, that the board may, in its discretion, dispense with an examination in the case of an osteopathic physician duly authorized to practice osteopathy in any other state or territory of the United States, or in the District of Columbia, having the same or equivalent educational standards as this state, who shall present a certificate of examination and registration by the legally constituted board of such state or district, accorded only to applicants of equal grade with those required in the State of Tennessee, or a certificate issued by the national board of examiners for osteopathic physicians and surgeons.

63-907. Right of licensees to practice. — Upon the issuance of certificate of fitness by the board and the issuance of a license and a certificate of registration by the state licensing board for the healing arts as provided in chapter 1 of this title, the person receiving same shall be entitled to practice osteopathy in any county in this state, in all its branches, as taught and practiced by the recognized associated colleges of osteopathy, with the right to use such drugs as are necessary in the practice of osteopathy, surgery, and obstetrics, including narcotics, antiseptics, anesthetics, and biologicals.''

Our Tennessee statutes do not define the science of osteopathy. From the ''Attorney's Dictionary of Medi-

cine" by J. E. Schmidt, P.H., D.S. and M.D., Litt. D., published in 1965 by Matthew Bender & Co., we copy the following definition of osteopathy:

"A system of diagnosis and treatment based on the theory that when the body is in a normal structural condition, has proper nutrition, and is in a favorable environment, it is capable of producing its own defense and remedies against disease. Hence it places its chief emphasis on the attainment of these three desirable conditions, using manipulation as its chief effort. In addition, surgical and medicinal methods are utilized, when manipulation does not suffice. In more recent years osteopathy has adopted many of the methods and procedures of standard medical practice."

Also from Webster's International Dictionary we find the following definition of osteopathy:

"A system of therapeutics based on the theory that diseases are due chiefly to mechanical derangement, esp. displacements of bones, as the vertebrae, with resultant pressure on nerves and blood vessels and corresponding interference with innervation and circulation. Treatment is directed toward mechanical correction, esp. by manipulation of the parts."

The practice of chiropractic in Tennessee is regulated by T.C.A. Section 63-401 through 63-420. Section 63-401 defines chiropractic as follows:

"63-401. 'Chiropractic' defined.—Chiropractic is defined as the science of palpating, analyzing, and adjusting the articulations of the human spinal column and adjacent tissues by hand."

The minimum requirements of an applicant for a license to practice chiropractic is set out in T.C.A. Section 63-409 which we copy as follows:

"63-409. Qualifications for examination.—Any person of good moral character shall be eligible for examination, provided he is a graduate of a school or college of chiropractic giving adequate courses in anatomy, physiology, bacteriology, pathology, chemistry, symptomatology, spinal analysis, hygiene, sanitation, principles and practice of chiropractic, and chiropractic philosophy, requiring actual attendance of four (4) school years of not less than nine (9) months each, and provided that every applicant for examination shall submit to the examining board satisfactory proof of his possession of a diploma from a standard accredited high school."

By Chapter 43 of the Public Acts of 1945 the science of naturopathy was defined as follows:

"By this Act Naturopathy is permitted to be practiced in the State of Tennessee under the provisions of this Act when a person is so qualified, and means, 'Nature cure or health by natural methods' and is defined as the prevention, diagnosis, and treatment of human injuries, ailments, and diseases by the use of such physical forces, as air, light, water, vibration, heat, electricity, hydrotherapy, psychotherapy, dietetics, or massage, and the administrations of botanical and biological drugs, but shall not include the administration of narcotics, sulfa drugs and other toxic drugs, or powerful physical agents, such as X-ray and radium therapy, or surgery, the 'minor matters' mentioned in Section 12 (Sec. 7025.12) of this act to be construed as

not including tonsillectomy, the opening of the thoracic or abdominal cavities or other major operations requiring an incision. Provided, that this bill or any language shall not apply to, or in any way affect Medical Doctors." Davis v. Beeler, 185 Tenn. 638, 207 S.W.2d 343.

Because licenses to practice naturopathy had been issued to a large number of unqualified individuals and a number of evils connected with the practice of the healing arts had ensued from the issuance of licenses to practice naturopathy, by Chapter 2 of the Public Acts of 1947 (T.C.A. Section 63-609) the practice of naturopathy as a separate science was prohibited. We copy such section as follows:

"63-609. Practice of naturopathy prohibited.—It shall be unlawful for any person to practice naturopathy in this state. Naturopathy means nature cure or health by natural methods and is defined as the prevention, diagnosis, and treatment of human injuries, ailments, and disease by the use of such physical forces, as air, light, water, vibration, heat, electricity, hydrotherapy, psychotherapy, dietetics, or massage, and the administration of botanical and biological drugs. Any violation of this section shall be a misdemeanor and shall be punishable accordingly. This section shall not apply to persons who comply with the regulatory laws of the state with respect to the practice of the various healing arts."

The Supreme Court of Tennessee, in the case of Davis v. Beeler, 185 Tenn. 638, 207 S.W.2d 343, upheld the validity of T.C.A. Section 63-609. The opinion by Justice Prewitt stated that the legislative intent was to prevent

the practice of naturopathy by ones having only limited qualifications and not possessing what might be termed a general practitioner's or osteopath's certificate and that the legislature did not intend to prohibit the performance of the acts of naturopathy themselves and that the statute merely required persons desiring to practice naturopathy to obtain a general practitioner's license or license to practice osteopathy.

It is to be noted that under the several code sections mentioned applicants to practice medicine and surgery must be certified by a board composed of M.D.'s and that applicants to practice osteopathy must be certified by a separate board composed of Doctors of Osteopathy. Applicants to practice chiropractic must be certified by a board composed of chiropractors. The only examination which practitioners of all branches of the healing arts must take is the examination in the basic sciences set out and described in T.C.A. Section 63-203 which we copy as follows:

"63-203. Certificate of ability required for examination in healing arts.—No person shall be eligible for examination or permitted to take an examination for a license to practice the healing arts or any branch thereof, or be granted any such license, unless he has presented to the licensing board, or officer empowered to issue such a license, a certificate of ability in anatomy, physiology, chemistry, bacteriology, and pathology (hereinafter referred to as the basic sciences), issued by the state board of examiners in the basic sciences."

It was stated in the argument of this case that the State of California and possibly the State of New Jersey

now require Doctors of Osteopathy and Doctors of Medicine to take the same examination in all fields of the healing arts before they are issued licenses to practice their respective sciences. Physicians with a Doctor of Medicine degree usually are referred to as allopaths. The definition of allopathy from Schmidt's Attorney's Dictionary of Medicine is as follows:

"A system of medicine employing remedies which affect the body in a way opposite from the effect of the disease treated. For example, a disease which causes the heartbeat to increase in rapidity is treated by a drug which slows the beat. In substance this is an approach opposite to that used in homeopathy; therefore the term allopathy is sometimes applied to the regular system of medicine."

Dr. Carpenter, the relator, testified as a witness in his own behalf upon the trial below and he was of the opinion that there was no substantial difference between allopathic medicine and osteopathic medicine. We quote from his testimony as follows:

"A. I would say presently there is no significant difference. There may be minor differences in the theory of causation, and treatment, but there are no significant differences. The treatment means are the same.

Q8. Speaking of the theories or different theories of medicine, who was the leading exponent of the osteopathic theory of treatment?

A. Dr. Andrew Taylor Still.

Q9. And, when was this that he—if I may say so, founded or started, osteopathic medicine?

A. He developed his theories and method of treatment from about 18—early 1870's and of course throughout his lifetime up until the First World War when he passed away.

Q10. Did he not offer numerous books on the practice of osteopathy?

A. He probably wrote to some extent. I don't know how many books he authored on the subject.

Q11. Did you study any of his books in your training?

A. No, we did not study any of Dr. Still's books.

Q12. What books did you study?

A. The books that we used in our osteopathic training were, for the most part, medical texts which are used in —were used in the average medical school at that time.

Q13. At the time of your education, professionally, did you study any purely osteopathic books?

A. Perhaps one or two. I don't remember.

Q14. What were the courses called or entitled?

A. Uh—we had a course in—in our freshman year entitled osteopathic theory and practice, I believe.

Q15. Do you recall what texts or books that you used?

A. No, I don't. I don't recall offhand.

\* \* \* \* \* \*

Q59. Doctor, in your opinion are there differences between the practice of allopathic medicine and osteopathic medicine?

A. I would say theoretically there is a difference.

Q60. Would you state what you understand the difference in the two theories to be?

A. I believe that the allopathic physician's theory or emphasis I should say is on organ systems rather than on the treatment of the patient as a whole, with little emphasis on the treatment of musculo-skeletal disturbances.

Q61. According to theory, where is the emphasis placed in osteopathic medicine?

A. Originally, as Dr. Still developed his concepts of osteopathy, he treated—he thought that most disturbances of a patient were due to a musculo-skeletal abnormality. You must keep in mind that in the latter part of the 19th century allopathic physicians had very little way of protective medication for treatment. He thought that by manipulation of certain areas of musculo-skeletal disturbances, he could increase the blood supply and increase the circulation of the system as well as alter the nerve supply to the diseased area of the body and cure disease as the result.

Q62. Do I understand you to say that allopathic—the allopathic theories have come over to the osteopathic theory of manipulation?

A. No, I don't mean—in some respects there are, of course.

Q63. Specify what respects?

A. Some orthopedic specialists agree that there are many instances in which manipulation of the back can correct conditions which before were treated rather successfully by other means.

Q64. Can you be a little more definite now? What conditions that used to be treated by what other means are now treated by manipulation by allopathic physicians?

A. Probably disc problems in some instances, minor deviations of bony structures or perhaps sub-luxation of joints.

Q65. What does that term mean?

A. Joints which are not dislocated but perhaps out of line to a minor degree.

Q66. Back to the original theory as you describe it of Dr. Still, has that theory been discredited?

A. I don't believe so. I think to the contrary, allopathy is more and more realizing the validity of those theories.

Q67. What specific illnesses are in your opinion benefited by manipulation?

A. I think—many illnesses may be due to disturbances of the blood supply.

Q68. Specify.

A. I don't think it is practical to specify now, especially. All organs—all parts of the body are supplied with blood and often times for some reason or other the blood and nerve supply to an area can be interfered with.

Q69. What do you call those conditions?

A. Illness.

Q70. Do you have any more specific term, other than 'illness'?

A. If you mentioned a part of the body, perhaps I could.

Q71. Well, you pick a part of the body and be a little more specific, if you will.

A. The lung.

Q72. Describe what conditions of the lung can be successfully treated by manipulation.

A. Pneumonia, or asthma or emphysema.

Q73. Now, will you state how, in your opinion, an asthmatic condition of the lung can be manipulated?

A. Are you asking me how I do it or how—are you asking how I do it?

Q74. Yes, or what.

A. Are you asking me how I would treat an asthmatic condition or—

Q75. Is there a distinction between how you would treat it—your theory, and how osteopathy would treat it?

A. I would say yes.

Q76. Well, first describe how you would treat it and then tell me the difference between that and the theoretical treatment.

A. I would treat asthma with bronchial dialators, depending on the severity of the case. Eplnepherine—in the average uncomplicated asthmatic, I would treat with bronchial dialators, expectorants and sedatives and forced fluids.

Q77. Now, do those treatments constitute manipulation?

A. No.

Q78. Well, my original question was, could that condition of asthma be helped by manipulation and I asked

you to describe that. I didn't understand your answer to be in the field of manipulation?

A. I did not mention manipulation might be a treatment of asthma.

Q79. Then I misunderstood you.

A. No, I don't think you misunderstood me.

Q80. I asked you to pick a section of the body and you picked the lungs?

A. Yes.

Q81. And I asked you to pick a part of the lung that could be successfully treated by manipulation and I thought you named pneumonia, asthma or emphysema. I asked you to describe how you would treat the condition of asthma by manipulation.

A. I did not mention the use of manipulation in the treatment of asthma, because I do not ordinarily use manipulation in the treatment of an asthmatic condition.

Q82. Can it be used in the treatment of asthma?

A. I think it can be.

Q83. Describe how—what manipulation you think could be used?

A. In as much as I do not use it, I don't think that I should describe the technique for the treatment of an asthmatic.

Q84. Then you do not subscribe to manipulation for an asthmatic?

A. I think it can be very helpful in the treatment of asthma.

Q85. Then will you describe how you would treat an asthmatic by manipulation?

A. I don't—''

Dr. A. L. Schrader of Trenton, Tennessee, who has a D.O. degree from Kirksville College and Surgery and who now practices surgery throughout West Tennessee in several osteopathic hospitals and clinics, testified as a witness for relator that there was very little difference between the practice of medicine and the practice of osteopathic medicine. Dr. Robert A. Kistner, who is the physician and dean of the Chicago College of Osteopathy and who also holds an M.D. degree from the Stritch School of Medicine of Loyola University of Chicago testified as follows:

''Q. Dr. Kistner, you are kind of a rare person in the United States in that you graduated from both an osteopathic institution and a medical institution. Would you state what differences there are in the education of an M.D. and an osteopathic physician?

A. That's a tough assignment, as you can well imagine. There's a great difference in schools in each profession depending on where they are and what they are, what they're made of. Each school has specific strengths and weaknesses, etc. As far as the difference in the two categorically professional schools, the basic training in each school is parallel. In the osteopathic school there is an additive area which is emphasizing the neuro-muscular skeletal portion of the body which is the essence of osteopathy, in the narrow sense, in the narrow use of the word osteopathy.

Q. What is the osteopathic theory?

A. This might be difficult to keep at a lay level. Essentially the profession, as you know, was started in 1875 by a medical man, Dr. Andrew Taylor Still, who felt that the skeletal system of the body was more important than just the means of holding the body together, that he recognized that certain neural and hormonal and arterial components had a control through the spinal-reflex centers. And in using this information, both diagnostically and therapeutically, he was able to help a patient maintain health and help a patient correct a disease process, in other words, build the individuals own resistance. This was in essence the beginning of the osteopathic profession. It has changed remarkably over the years as has allopathic medicine in education not only in its additional pre-profession requirements, the lengthening of the curriculum, the post-doctoral training program, the specialty schools, research. These have all come on to the point now that I think one could make the statement that there is a definite paralleling of education in the two schools. There are certainly differences. The osteopathic schools, this is on many records particularly congressional records, have, by design, the goal to build general practitioners in that seventy-five per cent roughly of our graduates do not enter general practice. Feeling that this is a need, this is the goal of the five schools. In many medical schools the design is not this. It is simply to, I shouldn't say 'simply', it is to train people in specialties in teaching, in research, and their curricula are geared to this; hence, there is a difference in the two schools and also there is a difference in a medical school which is geared toward specialty practice.''

There is very little communication between the allopathic physicians or M.D.'s in Tennessee and the Doctors of Osteopathy. We find from the preponderance of the evidence in this record that Doctors of Osteopathy tend less and less to use manipulation as a cure or treatment for illness or disease and tend more and more to practicing medicine in the manner followed by M.D.'s.

There are no Tennessee cases on the legality of a bylaw excluding osteopaths from the medical staff of a public hospital. Cases from other jurisdictions are in conflict.

In the case of Hayman v. City of Galveston et al. (1927), 273 U.S. 414, 47 S.Ct. 363, 71 L.Ed. 714, the appellant, a resident of the State of Texas and osteopathic physician duly licensed to practice in the State of Texas, brought suit against the Board of Commissioners of the City of Galveston alleging that the Board of Managers of a hospital had made regulations excluding the appellant and other licensed osteopathic physicians from practicing in the hospital and excluding patients who desired to be treated by appellant or other osteopaths in the hospital. From the opinion of the United States Supreme Court upholding the action of the Board of Managers of the hospital we quote at length as follows:

"But it is argued that, if some physicians are admitted to practice in the hospitals, all must be, or there is a denial of the equal protection of the laws. Even assuming that the arbitrary exclusion of some physicians would have that legal consequence in the circumstances of this case, the selection complained of was based upon a classification not arbitrary or unreasonable on its face. Under the Texas Constitution

and statutes, anyone who shall 'offer to treat any disease or disorder, mental or physical, or any physical deformity or injury by any system or method, or to effect cures thereof' is a physician and may be admitted to practice within the state. Article 16, Sec. 31, Texas Constitution; Complete Tex.Stat.1920, arts. 5739, 5741, 5745. We cannot say that a regulation excluding from the conduct of a hospital the devotees of some of the numerous systems or methods of treating diseases authorized to practice in Texas, is unreasonable or arbitrary. In the management of a hospital, quite apart from its use for educational purposes, some choice in methods of treatment would seem inevitable, and a selection based upon a classification having some basis in the exercise of the judgment of the state board whose action is challenged is not a denial of the equal protection of the laws. Compare Collins v. Texas, 223 U.S. 288, 32 S.Ct. 286, 56 L.Ed. 439; Watson v. Maryland, 218 U.S. 173, 30 S.Ct. 644, 54 L.Ed. 987; Crane v. Johnson, 242 U.S. 339, 37 S.Ct. 176, 61 L.Ed. 348, Ann. Cas.1917B, 796; Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643, 3 Ann.Cas.765.

The validity of the action of the board under the Texas Constitution is also before us. Article 16, Sec. 31, of the Texas Constitution provides:

'The Legislature may pass laws prescribing the qualification of practitioners of medicine in this state, and to punish persons for malpractice, but no preference shall ever be given by law to any schools of medicine.'

The limitation of the provision is obviously directed to the qualifications of those to be admitted to the

practice of their profession in the state and has nothing to do with the qualifications of those who are to be allowed to practice in a state hospital or to participate in an educational enterprise conducted by the state. Cf. Germany v. State, 62 Tex.Cr.R. 276, 137 S.W. 130, Ann.Cas.1913C, 477; Ex parte Gerino, 143 Cal. 412, 77 P. 166, 66 L.R.A. 249; Harris v. Thomas (Tex. Civ. App.) 217 S.W. 1068.

The action of the board does not violate rights or immunities guaranteed by either the state or the Federal Constitution.

Judgment affirmed."

In the case of Newton v. Board of Commissioners of Weld County (1929), State of Colorado, 86 Colo. 446, 282 P. 1068, plaintiff Newton, who had a license from the State of Colorado to practice medicine as an osteopathic physician brought suit against the Board of County Commissioners of Weld County, Colorado, to enjoin the enforcement by the Board of its general policy embodied in an adopted resolution the purpose as well as the effect of which is to bar osteopathic physicians from practicing their profession in the two existing county hospitals. The resolution permitted allopathic and homeopathic physicians to practice in the hospitals. The Supreme Court of the State of Colorado upheld the resolutions of the Board of County Commissioners and quoted with approval from the opinion of Hayman v. Galveston, supra.

In the case of Taylor et al. v. W. S. Horn, D.O., July 27, 1966, 189 So.2d 198, from the District Court of Appeals of the State of Florida the lower court had sustained a bill by an osteopath against the Board of Trustees of a county hospital to enjoin the enforcement of

a hospital bylaw that precluded osteopathic physicians and surgeons from practicing in a public hospital. On appeal the District Court of Appeals reversed. The bylaw required an applicant for membership in the medical staff to be a graduate of a recognized medical school approved and accredited by the American Medical Association, legally licensed to practice medicine in the State of Florida, and qualified for membership in the Manatee County Medical Society and practicing in Manatee County.

The District Court followed an earlier case of Richardson v. City of Miami (1940), 144 Fla. 294, 198 So. 51, which had upheld a similar bylaw which required graduation from class A medical schools with a degree of M.D. and eligibility for membership in the County Medical Association. In Taylor v. Horn, supra, the District Appeals Court referred to the cases of Munroe v. Wall (1959), 66 N.M. 15, 340 P.2d 1069; Wallington v. Zinn (1961), 146 W.Va. 147, 118 S.E.2d 526; and Duson v. Poage (1958), Court of Civil Appeals of Texas, 318 S.W. 2d 89, as being cases which upheld the validity of a hospital bylaw barring osteopathic physicians from practicing in county or public hospitals.

In the case of Duson et al. v. Poage et al (1958), Court of Civil Appeals of Texas, 318 S.W.2d 89, two osteopathic physicians, namely Drs. Poage and Boyd, had been appointed to the medical staff of the Nightingale County Hospital in Wharton County, Texas. All of the other members of the hospital staff were graduates of an allopathic college of medicine. The allopaths resigned, along with a number of nurses when the hospital board voted to reappoint Drs. Poage and Boyd. Thereafter the Board of Managers suspended Drs. Poage and Boyd from prac-

ticing in the hospital except for the treatment of their patients who had already been admitted. The board then passed a bylaw which required all members of the staff to be graduates of a school of medicine approved by the American Medical Association. After the enactment of this by-law, Drs. Poage and Boyd were removed from the hospital staff because they could not be re-elected under the new bylaw.

Drs. Poage and Boyd brought suit for declaratory judgment. The Court of Civil Appeals of Texas held that the bylaw providing that only graduates of a medical school approved by the American Medical Association could be members of the staff was invalid because it was an unlawful delegation of authority by the Board of Managers. However, the court held that the hospital board had the authority to exclude the plaintiffs from the hospital staff because they hold only a degree of Doctor of Osteopathy.

His Honor Chancellor McLemore was of opinion that the cases of Creisman v. Newcomb Hospital (1962), 76 N.J.Super. 149, 183 A.2d 878, and Falcone v. Middlesex County Medical Society (1961), 34 N.J. 582, 170 A.2d 791, were the better reasoned cases and were controlling of Dr. Carpenter's case. Accordingly, he held invalid and contrary to the law of public policy of Tennessee the by-law adopted by the Trustees of Henry County General Hospital.

The facts in the Falcone and Greisman cases are different from the case at bar. In the Falcone case, Dr. Falcone was a graduate of the College of Medicine of the University of Milan with a degree of Doctor of Medicine and Surgery but he had less than four years' attendance. The College of Medicine of the University of Milan was rec-

ognized and approved by the American Medical Association. He also held a degree of Doctor of Osteopathy from the Philadelphia College of Osteopathy which was not approved by the American Medical Association. The New Jersey Supreme Court held that the County Medical Society acted in an arbitrary, unreasonable and illegal manner in applying an unwritten requirement of four years' attendance at an AMA approved medical college and excluded Dr. Falcone from membership solely because he had not attended the College of Medicine at the University of Milan for the four-year period. Dr. Falcone was ordered admitted to membership in the medical society.

In the case of Greisman v. Newcomb Hospital (1962), 76 N.J.Super, 149, 183 A.2d 878, the plaintiff, Dr. Paul A. Greisman, D.O., brought suit to test the legality of a bylaw of the medical staff and Board of Trustees of Newcomb Hospital in Vineland, New Jersey, which included as basic qualifications for membership on the courtesy medical staff that the applicant be a graduate of a medical school approved by the American Medical Association and a full or associate member of the county medical society. Dr. Greisman was a graduate of the Philadelphia School of Osteopathy and had a full and unlimited license to practice medicine and surgery from the State of New Jersey. In the Greisman case the court held that the bylaw requiring membership in the medical society was illegal under the authority of the Falcone case and that the regulation that he be a graduate of a school approved by the American Medical Association insofar as it applied to Dr. Greisman was illegal, unreasonable and inconsistent with the public policy of the

State of New Jersey. From the opinion in the Greisman case we quote as follows:

"Furthermore, since the decision in the Falcone case, the Joint Commission on Accreditation of Hospitals has indicated that the presence on hospital medical staffs of doctors of osteopathy having full licenses as physicians and surgeons will not jeopardize, per se, accreditation of such hospitals by the American Medical Association.

Secondly, the Judicial Council of the House of Delegates of the American Medical Association has, since the decision in Falcone, adopted a statement of policy whereby local medical societies were authorized to practice with doctors of osteopathy where they (the local societies) determined that such doctors practiced on the same scientific principles as those adhered to by the members of the American Medical Association.

Lastly, the local determination required by the Judicial Council of the House of Delegates of the American Medical Association as aforesaid was supplied by a resolution of the Judicial Council of the Medical Society of New Jersey on July 12, 1961, in which it was declared that 'hereafter in New Jersey it shall not be unethical for members of the Medical Society of New Jersey to enter into voluntary professional association with any person holding a full license as a physician and surgeon granted by the State Board of Medical Examiners of New Jersey who adheres to the same scientific principles embraced by the members of the Medical Society of New Jersey.'

There is nothing of record to indicate that the plaintiff, Dr. Greisman, does not adhere to the same scientific

principles embraced by the members of the Medical Society of New Jersey.

In fact, it may be fairly inferred that he does, because he is the physician for two industrial companies and two schools and possesses a full medical licensure from the State of New Jersey.

In any event, this is a proper inquiry of the committee on admissions of the Newcomb Hospital and the medical staff thereof, who would conduct the interview with the plaintiff.

Thus, not only is it clear that the public policy of the State is somewhat adverse to the aforesaid by-law of the defendants, but it also appears that (1) the American Medical Association and the New Jersey Medical Society have no objection to voluntary association between osteopathic doctors who possess the required qualifications (as plaintiff does) and other medical doctors, and (2) the Newcomb Hospital will suffer no loss of accreditation by admitting the plaintiff to its medical staff, provided he possesses the necessary medical expertise.''

However, in Schneir, D.O., v. Englewood Hospital Association (1966), 91 N.J.Super. 527, 221 A.2d 559, the appellate court refused to order the plaintiff Schneir admitted to the courtesy medical staff of Englewood Hospital. The plaintiff Schneir, like Dr. Carpenter, was a graduate of Kirksville College of Osteopathy. Kirksville College has been approved by the State Board of Medical Examiners of the State of New Jersey. However, plaintiff Schneir had been granted a license in New Jersey based on reciprocity with the State of Missouri where he had taken a board examination shortly after graduating

from the Kirksville College. The appellate court found that the plaintiff was not denied admission because he was a Doctor of Osteopathy as in the Falcone and Greisman cases, supra, but that his application had been regularly processed by the hospital trustees and his application had been fairly considered. The plaintiff had not been rejected but the board was taking further time to consider the plaintiff's qualifications, the shortage of beds in the hospital, and the need for specialists in the hospital. The plaintiff had no medical specialty and had done no residency.

In the case of Stribling v. Jolley (1953), 242 Mo.App. 1123, 253 S.W.2d 519, a by-law by the trustees of a public hospital was held invalid for excluding osteopaths. The court mentioned that 21% of the practitioners in the State of Missouri were osteopaths and the percentage ran to 33⅓% in rural sections. A Missouri statute in dealing directly with hospital management expressly forbade any discrimination against any school of medicine recognized by the laws of the State of Missouri and provided that such practitioners were all entitled to equal treatment in hospitals caring for their patients.

In the case of Hamilton County Hospital v. Andrews (1949), 227 Ind. 217, 85 N.E.2d 365, the Supreme Court of Indiana upheld a rule of the hospital requiring a surgeon to have had one year's service as an intern in an approved hospital and three years of surgical training of the standard approved by the American College of Surgery.

In the case of Munroe v. Wall et al. (1959), 66 N.M. 15, 340 P.2d 1069, the Supreme Court of New Mexico upheld a regulation by the Board of Trustees of a hos-

pital that members of the medical staff must be physicians who are graduates of medical schools approved by the American Medical Association and refused to order the plaintiffs who were D.O.'s admitted to the staff even though a state statute provided that osteopathic physicians and surgeons should have equal rights, privileges, and obligations in rendering medical services in all branches and phases of the healing arts as were accorded or permitted physicians and surgeons of other schools of practice.

In Wallington v. Zinn (1961), 146 W.Va. 147, 118 S.E. 2d 526, the trustees of the hospital first admitted the plaintiff, a D.O., to the medical staff. Later the Joint Commission on Accreditation of the American Medical Association rescinded the accreditation presumably because the plaintiff D.O. had been admitted to the staff. Thereafter the hospital trustees rescinded plaintiff's appointment and he brought suit for reinstatement. It was held by the Supreme Court of West Virginia that the rule excluding osteopaths from the medical staff was a reasonable restriction. See General Statement in 40 Am.Jur.2d 857, Hospitals and Asylums, Section 9.

We think the most important distinction between the case at bar involving Dr. Carpenter and the Falcone and Greisman cases from New Jersey followed by Chancellor McLemore is that the Kirksville College of Osteopathy from which he graduated has never been approved by the Board of Medical Examiners of the State of Tennessee and Dr. Carpenter has never been examined by the Board of Medical Examiners of the State of Tennessee.

There are approximately 3,500 M.D.s in Tennessee licensed to practice and only about 75 D.O.'s licensed to

practice. The court takes judicial knowledge of the fact that there is a shortage of M.D.'s especially general practitioners, in the State of Tennessee to meet the demand and need. It is unfortunate that the American Medical Association has not promoted and encouraged the building of additional medical schools to graduate new M.D.'s proportionate to the growth in population and national prosperity. Doctors of Osteopathy as a group are enjoying increased patronage each year and apparently the quality of their education and training is being improved each year. However, the people in Tennessee are dependent primarily upon the M.D.'s as a profession for medical services in all fields: in research, in preventive medicine, in psychiatry, in surgery, and in general medicine.

Necessarily hospital trustees and officials must be vested with a large measure of management discretion in the selection of members of the medical staff of a hospital. The trustees are charged with the duty of establishing and maintaining a high standard of medical and hospital care for the community. When a physician is admitted to the medical staff of a hospital, the public justifiably assumes that the management vouches for the competency of such physician. Members of the staff take turns "being on call" or "on duty at the hospital." Emergency patients often have no alternative but to be treated by such staff member "who is on call or on duty" even though such patients do not know such staff member. Such emergency treatment often involves major surgery or other treatment attended by great risk to the patient.

Hospital trustees are often laymen. They must rely upon professional or expert assistance in judging the qualifications of applicants to the medical staff. Since

D.O.'s and M.D.'s do not generally attend the same medical colleges and do not generally receive internship training at the same hospitals; and since they are not examined and licensed by a common medical examining board in Tennessee, we hold that the trustees of a public hospital have a legal right to accept only M.D.'s as members of the medical staff to the exclusion of D.O.'s and other practitioners who are not M.D.'s.

Our Tennessee Legislature set a precedent by designating M.D.'s as members of the State Hospital Board to the exclusion of D.O.'s back in 1947 in the enactment of what is now T.C.A. Section 53-1303. This legislation provided for the regulation of hospitals in Tennessee. Again in 1968 the Legislature continued the precedent and designated M.D.'s as members of the board to the exclusion of D.O.'s by the amendment increasing the number of the members of the hospital board from eight to eleven. We copy T.C.A. Section 53-1303 as amended in full as follows:

"53-1303. Board—Membership — Terms of office—Vacancies. — The board shall consist of eleven (11) members, who shall be appointed by the governor, two (2) of whom shall be graduates of recognized schools of medicine with the degree, Doctor of Medicine, and shall have an unlimited license to practice medicine in the State of Tennessee, one (1) of whom shall be a dentist, who shall be an oral surgeon licensed to practice in Tennessee, one (1) of whom shall be a graduate pharmacist who shall hold a degree in pharmacy from a recognized school of pharmacy and shall be licensed to practice pharmacy in Tennessee, one (1) of whom shall be a registered nurse, two (2) of whom shall be persons engaged in hospital administration of short

term acute hospitals, and two (2) of whom shall be administrators of nursing homes licensed by the department of public health as nursing homes, one (1) of which shall represent a hospital-operated nursing home. The two (2) remaining members shall be ex-officio members, namely the commissioner of the state department of public health and the chairman of the council who shall serve concurrently with the terms of their respective offices. The commissioner shall be chairman of the board. As the terms of members of the board as at present constituted expire, their successors shall be named, each for a term of four years, except as hereinafter provided in this section. The three (3) new members which are added to the board as of April 4, 1968 shall be appointed by the governor as follows: of the nursing home administrators, one (1) shall be appointed for a term to expire April 1, 1969, and one (1) for a term to expire on April 1, 1970; the new member from the medical profession shall be appointed for a term to expire on April 1, 1971; and all subsequent appointments, including the successors of the three (3) new members shall be for a term of four (4) years. If any vacancy occurs in the board for any reason other than expiration of term, the appointments shall be for the unexpired term. Any vacancy shall be filled from the same group as was represented by the outgoing member.''

Insofar as the by-law complained of affects Dr. Carpenter we hold that it is not illegal because admittedly Dr. Carpenter is not a graduate of a medical school approved either by the American Medical Association or by the Tennessee Board of Medical Examiners. The full wording of the by-law as revised through 1964 is as follows:

"ARTICLE III—MEMBERSHIP
SECTION I—QUALIFICATIONS

The applicant for membership on the medical staff shall be a graduate of an approved medical school legally licensed to practice in the State of Tennessee (qualified for membership in the local Medical Society) and practicing in the community or within a reasonable distance of the hospital. He shall be of good moral and professional standing."

This language is slightly different from that contained in 63-611 setting up the minimum requirements for a license to practice medicine in Tennessee which we have quoted hereabove in this opinion.

It is unnecessary for us in this opinion to adjudicate whether under the authority of Henderson v. City of Knoxville (1958), 157 Tenn. 477, 9 S.W.2d 697, that portion of the by-law requiring the applicant to be qualified for membership in the Henry County Medical Society would be valid against an attack by an M.D. duly licensed under T.C.A. Section 63-611 who had been denied membership in the Henry County Medical Society.

The decree of His Honor the Chancellor requiring the Board of Trustees of the Hospital to consider the application of Dr. Carpenter for admission to the medical staff without regard to the by-law requiring him to be a graduate of an approved medical school with an M.D. degree is reversed and the original bill is dismissed. The costs in the lower court and in this court will be taxed one-half to the plaintiff, Dr. Carpenter, and one-half to the appellants. T.C.A. Section 20-1621.

Bejach and Matherne, JJ., concur.