Anthony BOUCHER

v.

Syed SAYEED et al.

John JOSEPH

v.

Louis A. SAGE et al.

Nos. 82–97–M.P., 82–101–M.P.

Supreme Court of Rhode Island.

April 14, 1983.

Mandell, Aisenberg & Goodman, Ltd., Martin W. Aisenberg/Mark Mandell, Decof & Grimm, Leonard Decof, Peter Cerilli, Providence, for plaintiffs.

Iannuccillo & Hines, Richard A. VanTienhoven, Hanson, Curran & Parks, Kirk Hanson/Dennis J. McCarten, Rice, Dolan, Kiernan & Kershaw, John F. Dolan, Providence, for defendants.

## OPINION

KELLEHER, Justice.

We have consolidated these petitions for the common-law writ of certiorari and have agreed to review orders entered in two unrelated medical malpractice actions by two different justices of the Superior Court, each of whom had vacated the assignment of each case for a preliminary hearing at which a determination was to be made by each justice concerning whether the evidence presented at the hearing, "if properly substantiated * * * would be sufficient to raise a legitimate question of liability appropriate for judicial inquiry or whether the plaintiff's case is merely an unfortunate medical result." The vacating of each assignment was based upon each justice's belief that the preliminary-hearing procedures mandated by the Medical Malpractice Reform Act of 1976, specifically G.L. 1956 (1981 Reenactment) §§ 10–19–1, –2, –3, –4, and –5, violated the plaintiffs' federal constitutional right to equal protection of the laws.

We begin our consideration of the various positions espoused by the litigants with a backward look to the mid-1970s and the Legislature's response to certain events that, for want of a better phrase, could be described as the mid-1970s medical malpractice crisis. On the morning of March 31, 1976, there appeared on page B–7 of the Providence Journal an article headlined "House Gets Proposed Cure for Malpractice Problem." The article, after informing the reader that on the previous day a bill resulting from a study by a twenty-five-member commission had been introduced in the Rhode Island House of Representatives, described the proposed legislation as an effort to "stave off a threatened doctors' strike in protest against mounting malpractice insurance premiums that they were being forced to pay."

On page 1 of its report, the medical malpractice commission acknowledged that there was a "medical malpractice problem," the immediate cause of which was the high cost and the scarcity of medical malpractice insurance, which in turn was due to an increase in the number of claims, an increase in the amount of damage awards, and the insurers' long-standing policy of offering insurance on an "occurrence" basis.[1] These conditions, the commission ob-

---

1. An "occurrence" policy protects the insured from liability for any act done while the policy is in effect; on the other hand a "claims made" policy protects the insured only against claims made during the policy's life. In *Barry v. St. Paul Fire & Marine Insurance Co.,* 555 F.2d 3 (1st Cir.1977), St. Paul had changed its malpractice policies to provide coverage only on a claims-made basis rather than on an occurrence basis; consequently, a group of Rhode Island physicians instituted suit against four of the major providers of malpractice insurance in this state, alleging a violation of federal antitrust laws. The United States Supreme Court upheld the Court of Appeals for the First Circuit, which allowed the plaintiffs to seek injunctive relief and triple damages pursuant to the Sherman Act. *St. Paul Fire & Marine In-*

served, brought about a situation in which insurers were seeking an increase in premiums or, in some instances, a complete withdrawal from the medical malpractice facet of the industry; and physicians in turn were resentful of "steep increases in premium rates (especially those in the high-risk specialties) and refuse to practice at all without some kind of insurance protection. The threat of a doctors' strike creates a crisis which state government must solve."

One of the commission's proposed solutions to the crisis was the creation of medical-liability panels. The terms of this concept were spelled out in section 6 of the 1976 legislation and consisted of the addition of chapter 19 to title 10 of G.L.1956 (1969 Reenactment). This legislation provided that, if possible, any Superior Court malpractice suit was to be initially considered within ninety days of its inception by a mediation panel consisting of a special master, a physician, and an attorney. The trio was selected by the presiding justice of the Superior Court. The masters were taken from a rotating panel of masters appointed by the presiding justice, whereas the physicians and attorneys were selected from lists provided to the presiding justice by the Rhode Island Medical Society and the Rhode Island Bar Association respectively. Witnesses could be subpoenaed to testify at the hearing held by the panel on its own initiative or upon motion of either party. The hearing was to be conducted pursuant to the rules of evidence and the procedural rules employed in the Superior Court. The panel's findings on the facts and its conclusions of law were to be reduced to writing. Damages were to be itemized in regard to the relevant category, such as future medical expenses or loss of earning capacity. Either party could reject the panel's findings and continue the action in court. All of the panel's findings except

those relating to damages were admissible at trial.

The Medical Malpractice Reform Act of 1976 took effect on September 1, 1976. Time marched on until October 9, 1980, when the presiding justice of the Superior Court wrote to Governor J. Joseph Garrahy and, after detailing various statistical data relating to the performance of the mediation panels during a four-year period, stated: "I think it is fair to say that the consensus of the majority [a group of interested attorneys, doctors, and governmental officers who had conferred with the presiding justice] is that the Rhode Island procedure has failed to achieve the objective for which it was designed."[2] Later, the presiding justice released statistics that indicated that as of November 19, 1980, of the 266 mediation panels appointed since the effective date of the act only 57 panels had resolved the controversies brought before them; the remaining 209 controversies were still unresolved.

The Legislature responded to the presiding justice's comments with the introduction on March 12, 1981, of Senate bill No. 81–991. When the bill emerged from the Senate Judiciary Committee on May 8 as "81–991 (Substitute A)," Senator Revens, in moving its passage, described the 1976 mediation system as "a failure."[3] The substitute bill became law on May 18, 1981, and was designated by the Secretary of State as P.L.1981, ch. 187. Today it is cited as G.L. 1956 (1981 Reenactment) chapter 19 of title 10 (1982 Cum.Supp.).

With its adoption of P.L.1981, ch. 187, the Legislature amended chapter 19 of title 10 in its entirety and established a substantially different system for the processing of medical malpractice complaints. The 1976 three-person panel was replaced by a Superior Court justice who was to hold a preliminary hearing within ninety days of the

surance Co. v. Barry, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978). This litigation was subsequently settled.

2. See Rhode Island Lawyers News, December 1, 1980, p. 1.

3. Providence Journal Bulletin, May 9, 1981, p. A–10.

filing of the health-care provider's answer [4] to the plaintiff's complaint. The justice who conducts the hearing can *sua sponte* subpoena records or individuals to supplement the evidence presented by the parties as well as appoint impartial experts to examine either the plaintiff or relevant evidentiary material.[5] Designated as admissible evidence at the hearing are "hospital and medical records, nurses' notes, X-rays and other records kept in the usual course of the practice of the health care provider without the necessity for other identification or authentication * * *."[6] The hearing justice is also authorized to consider "statement[s] of fact or opinion on a subject contained in a published treatise, periodical, book or pamphlet or statements by experts without the necessity of such experts appearing at said hearing."[7]

Once the hearing is completed, the trial justice is required to "make a finding of fact as to whether the evidence presented if properly substantiated and viewed in the light most favorable to the plaintiff would be sufficient to raise a legitimate question of liability appropriate for judicial inquiry or whether the plaintiff's case is merely an unfortunate medical result."[8] If the finding is one of unfortunate result, the action "shall be dismissed with prejudice."[9] Although the act is silent about a finding "sufficient to raise a legitimate question of liability," it seems safe to say that the controversy would proceed to a de novo

hearing held, in most instances, before a Superior Court jury. A "health-care provider" is defined as a "licensed physician as defined in section 5–37.1–1 or a hospital, clinic, health maintenance organization or professional service corporation providing health care services and organized under chapter 5.1 of title 7."[10] A physician is defined in § 5–37.1–1 as any person who has been licensed by the state "to practice allopathic or osteopathic medicine." Physicians with a doctor of medicine degree are often referred to as allopaths. *State ex rel. Carpenter v. Cox,* 61 Tenn.App. 101, 115, 453 S.W.2d 69, 75 (1969).

One more brief look backward is in order before we turn to the merits of the pending appeals. The front page of the Providence Evening Bulletin for June 10, 1975, carried a story bearing a headline that read, "Panel Set Up to Insure Rhode Island Doctors." The story revealed that the Director of Business Regulation had announced the enactment of an emergency regulation and the creation of a medical malpractice Joint Underwriting Association, a shared-risk pool in which all insurers would participate and physicians would have a choice of claims-made coverage or occurrence coverage. In 1976,[11] with its enactment of P.L. 1976, ch. 1, the Legislature amended title 42 of the General Laws by the addition of ch. 14.1, thereby validating the 1975 emergency regulation and designating the Joint Underwriting Association as the exclusive agency

---

**4.** G.L.1956 (1969 Reenactment) § 10–19–2.

**5.** G.L.1956 (1969 Reenactment) § 10–19–3.

**6.** *Id.*

**7.** *Id.*

**8.** G.L.1956 (1969 Reenactment) § 10–19–4.

**9.** *Id.*

**10.** G.L.1956 (1969 Reenactment) § 10–19–5.

**11.** It should be noted that the 1976 Medical Malpractice Reform Act effectuated several changes in addition to the establishment of mediation panels. It also created (1) a grievance procedure whereby complaints of professional misconduct against any licensed physi-

cian or osteopath would be investigated and, if need be, tried before a board of medical review, (2) recertification procedures requiring one seeking to renew a license to present satisfactory evidence of continuing medical education to the board of medical examiners, (3) a mechanism for reporting court judgments and settlements in malpractice controversies, and (4) procedures to be followed whenever a hospital seeks to discipline one of its staff members. The issues of informed consent and res ipsa loquitur have been designated as preliminary questions of fact to be determined by the trial justice prior to their submission to the jury, and evidence of collateral benefits received by a plaintiff in a malpractice action is now admissible.

through which medical malpractice insurance would be written in the state. Later in the session, with the enactment of P.L. 1976, ch. 79, the exclusive clause was deleted, but the Association was authorized to issue malpractice and incidental liability insurance to physicians, hospitals, and other health-care providers.

With this historical perspective in mind, we turn to the merits of the appeals before us. The trial justices below [12] ruled that the 1981 statute impermissibly discriminated between certain classes of individuals. Specifically, they found that no rational basis existed to support the distinctions between (1) medical malpractice claimants and tort plaintiffs as a whole and (2) certain defined medical tortfeasors and others similarly situated in the field. The plaintiffs urge us to affirm these findings, arguing not only that the statute violates the equal-protection clause of the Fourteenth Amendment but also that it abridges an individual's right to a jury trial as guaranteed by art. XLIII, sec. 1, of the Rhode Island Constitution.

For the reasons that follow, we find P.L. 1981, ch. 187, unconstitutional in its entirety because it denies litigants equal protection of the laws. Because we strike the statute down on equal-protection grounds, we find it unnecessary to reach the jury-trial issue. [13]

■ A fundamental principle of equal-protection analysis is that not all legislative classifications are impermissible. In fact, the Fourteenth Amendment permits states a wide scope of discretion in enacting laws that affect some classes of citizens differently from others. *Burrillville Racing Ass'n v. State,* 118 R.I. 154, 157, 372 A.2d 979, 981–82 (1977). The critical question is whether there exists an appropriate governmental interest suitably furthered by the differential treatment. *Police Department of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212, 216 (1972). Both the nature of the classification and the individual rights upon which it may infringe must be scrutinized to determine legislative compliance with equal-protection standards. In arriving at this determination, courts have traditionally adhered to a two-tiered standard of review employing strict and minimal scrutiny.

■ Strict scrutiny is applied when a statute's differential treatment of a select class of persons either infringes upon fundamental rights [14] or results in the creation of a suspect classification.[15] Such discrimination can only be justified by a compelling state interest. On the other hand, minimal scrutiny is generally applied to economic and social regulations. Under this standard, the court merely determines whether the differential treatment bears a reasonable or rational relationship to a legitimate state interest.[16]

■ In the instant matter, we are of the opinion that the classifications created

---

12. The original findings of fact and declarations of law were made by Justice Lagueux in *Boucher v. Sayeed,* No. 82–97–M.P. Justice DeRobbio concurred with these conclusions and incorporated them into his decision in *Joseph v. Sage,* No. 82–101–M.P.

13. Although we decline to reach this issue, it is doubtful that § 10–19–4 of the statute, which provides for the dismissal of actions with prejudice upon a "finding of fact" by the trial justice, could pass constitutional muster. The law, as written, provides no recourse for a plaintiff whose claim is denied by the hearing justice, thereby infringing upon his right to a jury trial. As we pointed out in *Dyer v. Keefe,* 97 R.I. 418, 420, 198 A.2d 159, 160 (1964):

"[T]rial by jury is inviolate. The state constitution so declares. * * * The right is thus placed absolutely beyond the power of the legislature to alter or abolish it."

14. *See, e.g., Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (right to marry); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (right to travel).

15. *See, e.g., Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (alienage); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (race).

16. *See, e.g., Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

by the statute neither infringe upon fundamental rights nor employ suspect classifications. Most courts reviewing malpractice-reform acts have reached similar conclusions. *See, e.g., Doran v. Priddy,* 534 F.Supp. 30 (D.Kan.1981); *Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825 (1980); *Beatty v. Akron City Hospital,* 67 Ohio St.2d 483, 424 N.E.2d 586 (1981). Consequently, in evaluating the challenged classifications, we shall apply the lower-tier, rational-basis standard [17] and inquire whether the classifications rationally further a purpose articulated by the state. *Issarescu v. Cleland,* 465 F.Supp. 657, 660 (D.R.I.1979). Our analysis under equal-protection standards will also comport with the well-settled principle that the judiciary affords challenged legislation a presumption of constitutionality. *Burrillville Racing Ass'n v. State,* 118 R.I. 154, 157, 372 A.2d 979, 982 (1977). Furthermore, we are mindful that a party seeking a judicial veto of a legislative act on constitutional grounds carries the burden of persuasion. *Id.*

■ Proceeding with these general rules as our guide, we begin our search for some rational basis to support the enacted legislation. The trial justice took judicial notice of the fact that at the time the legislation in controversy was enacted in 1981, the malpractice crisis of 1975–76 justifying the earlier act no longer existed. It has been long established that courts may uphold the constitutionality of legislation in the face of an equal-protection challenge by taking judicial notice of generally known or easily ascertainable facts. *Shavers v. Kelley,* 402 Mich. 554, 614, 267 N.W.2d 72, 94 (1978), *cert. den.* 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 303 (1979); *see Borden's Farm Products Co. v. Baldwin,* 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281 (1934). Consequently, a party challenging the legislative judgment may attack its constitutionality by bringing to the court's attention any facts that the court can judicially notice to support the proposition that the legislative judgment is without rational basis. *Shavers, supra* 402 Mich. at 614–15, 267 N.W.2d at 94.

■ Judicially noticed facts are categorized as either "adjudicative" or "legislative." Generally speaking, adjudicative facts are those developed in a particular case concerning the immediate parties whereas legislative facts are established truths, facts, or pronouncements that do not change from case to case. *United States v. Gould,* 536 F.2d 216 at 219–20 (8th Cir. 1976). According to Professor McCormick, legislative facts are the social, economic, political, and scientific facts that simply supply premises to guide judges in the process of their legal reasoning. In particular, judicial notice of such facts may occur when a judge decides upon the constitutionality of a statute. McCormick, *Evidence* § 328 at 759, § 331 at 766–67 (2d ed. 1972). We implicitly recognized the distinction between legislative and adjudicative facts in *Caldarone v. State,* 98 R.I. 7, 13, 199 A.2d 303, 306 (1964), where we took judicial notice of the changing character of the commercial and industrial life of Providence:

"Suffice it to observe that he [trial justice] was taking judicial notice of that which is common knowledge, not to supply evidence on an essential element of petitioner's case but rather to illustrate the circumstances in the light of his evaluation of the evidence adduced by the parties."

■ Applying these general definitions to the present controversy, it is clear to us that the trial justice noticed a legislative

---

17. Courts in some jurisdictions reviewing similar medical malpractice statutes have applied the so-called "intermediate" test, which requires a more rigorous standard of judicial scrutiny than allowed under the traditional rational-basis test. *See, e.g., Carson v. Maurer,* 120 N.H. 925, 932–33, 424 A.2d 825, 830–31 (1980); *Johnson v. St. Vincent Hospital, Inc.,* 404 N.E.2d 585, 587 (Ind.1980). Because we find that the legislation before us fails to meet the minimal standards of the lower-tier test, we decline to entangle ourselves in the constitutionally oblique debate over the applicability of a middle-tier standard of review to equal-protection analysis.

rather than an adjudicative fact when he determined that no malpractice crisis existed in 1981. We concur with this finding. Statutes aimed at providing relief in a time of crisis depend for their validity upon a proper exercise of the police power and ordinarily contain a declaration of legislative findings of fact involving the public health, safety, or morals. *Opinion to the Governor,* 75 R.I. 54, 63, 63 A.2d 724, 729 (1949). The statute in question does not contain such a declaration. Because no obvious crisis exists to support the challenged legislation, we shall invoke the teachings of *Women's Liberation Union of Rhode Island, Inc. v. Israel,* 379 F.Supp. 44, 49 (D.R.I. 1974), and decline to speculate about unexpressed or unobvious permissible state interests.

A plethora of facts exists to substantiate the trial justice's finding that no malpractice crisis existed in 1981. Unlike the period 1975–76, doctors in 1981 were not threatening to withdraw their services because of high rates or the inability to obtain malpractice insurance. On the contrary, a stable market existed for the purchase of insurance through the creation of the Joint Underwriting Association. A Providence Journal article dated December 22, 1980, noted that the "trouble" (threatened physicians' strike) dissipated with the enactment of legislation designed to lower premium rates and to curb litigation. The article emphasized that "[l]ittle has been heard of the malpractice problem since [enactment of the 1975–76 legislation]." And at least one commentator has noted:

> "Although at the time of its creation the Rhode Island medical liability panel may have been a rational response to the malpractice 'crisis', the present need for such a procedure may no longer exist. The cost of medical malpractice insurance may have stabilized independent of the mediation panels, or premium increases may have occurred independent of the incidents of malpractice claims filed. If so, the state malpractice statute could not withstand an equal protection challenge even under the rational basis test because

the panel system would no longer serve a legitimate governmental function." Note, *Rhode Island Medical Liability Mediation Panels: Constitutional Challenges and Impact on Informed Consent,* 15 Suffolk L.Rev. 563, 578–79 (1981).

Relying upon the foregoing rationale and our willingness to take judicial notice of changing times and conditions, *see, e.g., Opinion to Governor,* 75 R.I. 54, 63 A.2d 724 (1949), and *Wrenn v. Ehrlich,* 59 R.I. 87, 194 A. 534 (1937), we are unable to sustain the 1981 legislation on the ground that it was enacted as a rational response to a public-health crisis.

Absent a crisis to justify the enactment of such legislation, we can ascertain no satisfactory reason for the separate and unequal treatment that it imposes on medical malpractice litigants. The statute constitutes special class legislation enacted solely for the benefit of specially defined defendant health-care providers. As the trial justices correctly noted, the preliminary-hearing requirement applies when a plaintiff sues on a claim that he or she has been injured by the negligence of a medical doctor or a hospital but does not apply to actions against certain other tortfeasors in the health-care field such as unincorporated dentists, nurses, and physical therapists. Perhaps more egregious is the fact that the statute treats medical malpractice plaintiffs differently from nonmedical tort plaintiffs as a whole. In the absence of an identifiable legitimate governmental interest, these class distinctions constitute a patent violation of one of the most fundamental tenets of equal protection, namely, that persons similarly situated shall be treated in a like manner.

Other ostensible objectives of this legislation urged upon us by defendants are to protect the public health by ensuring the continuous availability of quality health services and to weed out frivolous claims. These arguments are not convincing. Insofar as frivolous claims are concerned, the trial justices remind us that the Rules of Civil Procedure provide appropriate ave-

nues for all litigants to achieve this objective. Furthermore, commentators have noted that preliminary-hearing laws fail to increase judicial efficiency by expediting the disposition of cases. *See* Note, *Rhode Island Medical Liability Mediation Panels: Constitutional Challenges and Impact on Informed Consent,* 15 Suffolk L.Rev. 563, 565 (1981); *Medical Malpractice Panels: A Judicial Evaluation of their Practical Effect,* 42 U.Pitt.L.Rev. 939, 958 (1981).

Concerning the public-health contention, we agree with the observation made in *American Bank & Trust v. Community Hospital,* 104 Cal.App.3d 219, 163 Cal.Rptr. 513, 522 (1980), that if the medical profession is less accountable than formerly because of the special treatment it is afforded by preliminary-hearing laws, then a relaxation of medical standards may occur with the public as the victim. "[T]o find that the protection and special dispensation given to health delivery tortfeasors by the challenged legislation is in the best interest of public health is illogical to the point of irrationality." *Id.*

This legislation confers salutary privileges while imposing unjustifiable disabilities upon arbitrarily selected classes of persons in violation of equal-protection standards. The plaintiffs have successfully overcome their burden and have rebutted the legislative presumption of constitutionality by demonstrating that the statute lacked any rational basis to justify the differential treatment contained therein. Consequently, we are compelled to declare P.L.1981, ch. 187, unconstitutional.

In each case the petition for certiorari is denied and dismissed, the writ heretofore issued is quashed, 445 A.2d 877 (R.I.1982), and the records certified to this court are ordered returned to the Superior Court with our decision endorsed thereon.

WEISBERGER, J., did not participate.