DECISION
The plaintiffs have filed timely, albeit non-denominated, Rule 12(f) motions to strike each of the defendants' thirteenth affirmative defenses as "insufficient." By their thirteenth affirmative defenses, each defendant "relies upon all benefits, rights and protection pursuant to Section 9-19-34.1 of the Rhode Island General Laws, the so-called Collateral Source Rule." The plaintiffs argue that this section violates their rights to equal protection under both the United States and Rhode Island constitutions and is thus unconstitutional.[1]
The Attorney General, after notification, declined to intervene.
The parties submitted initial memoranda. After consideration of those memoranda and the relevant law, this justice scheduled a conference with the attorneys to discuss the matter of supplemental memoranda. We agreed that the attorneys would submit additional memoranda that more fully developed the issues. Thereafter, and in anticipation of having to render a decision on this significant issue, this justice continued her consideration of the matter. Several months went by and, when no further memoranda were forthcoming, counsel were contacted to determine the status of the matter. Counsel informed this justice that the parties had agreed to forego the supplemental memoranda, had agreed to defer the matter until the time of trial, and intended to raise the question with the trial justice when the case was reached for trial. Given the resources already expended by the Court on the motion, the practical realities associated with blithely tossing a matter of this nature to another justice in the trial context, and the fact that the motion was never formally withdrawn, this justice determined that it was appropriate to rule on the motion and the Court now proceeds with this decision.
The plaintiffs have asserted in their brief that § 9-19-34.1, as adopted in 1986, was meant to address "`the significant number of medical . . . malpractice claims' and the `cost of settling such claims by the . . . Joint Underwriters Association,' the insolvency of which would negatively impact the taxpayers of this State." The plaintiffs argue, however, that the ill this legislation addressed no longer exists. They also assert that whereas in 1986 the Joint Underwriters Association (JUA) was "the primary medical malpractice insurer" in Rhode Island, the Department of Business regulation now lists approximately seventy-five companies that issue medical-malpractice policies in this State.
Turning now to the plaintiffs' equal-protection challenges, the Court first observes that because the equal-protection guarantees of the Fourteenth Amendment to the United States Constitution and article 1, section 2, of the Rhode Island Constitution provide for similar protections, a separate analysis is unnecessary.
It is well settled that any equal-protection analysis begins with an examination of the nature of the classification created by the Legislature. When the classification does not involve a fundamental right and is not related to a suspect classification, the test for constitutionality is more relaxed. In that instance the legislation need only be "rationally related to a legitimate state interest" in order to survive constitutional scrutiny. Because § 9-19-34.1 is concededly designed to accomplish purely economic and social purposes and because it does not implicate either a fundamental right or a suspect classification, it will impair the equal-protection clause only if the classification it draws is "wholly irrelevant to the achievement of the State's objective." Furthermore, a statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. Thus, when a challenged economic or social statute responds to a legitimate legislative concern and that statute may achieve a resolution of that problem, it must be sustained on equal-protection grounds. Finally, legislative enactments of the General Assembly are presumed to be constitutional and the challenging party bears the burden of proving otherwise beyond a reasonable doubt. Rhode Island Insurers' Insolvency Fund v.Leviton Manufacturing Co., 716 A.2d 730, 733-34 (R.I. 1998).
When deciding if a statute complies with equal-protection standards, both the nature of the classification established by the act and the individual rights that may be violated by the act must be examined. The Court's first task, then, is to delineate the nature of the classification drawn by § 9-19-34.1. Essentially, this section gives defendants in medical-malpractice actions the right to introduce evidence of amounts paid to a plaintiff as a result of their injury. The defendant is then entitled to have any award for damages reduced by the amount plaintiff received collaterally. This is, of course, contrary to the generally prevailing rule which renders evidence of payments made to an injured party from collateral sources inadmissible. Votolato v. Merandi, 747 A.2d 455, 463 (R.I. 2000); Gelsomino v. Mendonca, 723 A.2d 300, 301 (R.I. 1999) ("`The rationale of this rule is that the injured person is entitled to be made whole, since it is no concern of the tort-feasor that someone else completely unconnected with the tort-feasor has aided his victim' . . . and the `wrongdoer, responsible for injuring the plaintiff, should not receive [this] windfall.'").
Broadly speaking, then, the classification is made up of individuals who have suffered damages as victims of a particular tort, negligence, where that negligence has been committed by a distinct group of professionals, i.e., those in the medical profession. While § 9-19-34.1 could apply to any victim of medical malpractice, as an evidentiary rule its direct effect touches only those who bring a civil action in the Courts of this State[2] and whose cases are resolved by trial on the merits. It is a generally known and easily ascertained, see Rule 201 of the Rhode Island Rules of Evidence, that only some 2-3% of all civil filings in the State of Rhode Island are tried by a fact finder such that an evidentiary rule would be directly implicated. See 1999 Rhode Island Report on the Judiciary 56-57. It is also generally known and easily ascertained that of the thousands of civil cases filed each year in the State Court system, only a tiny minority are medical-malpractice cases. For example, in 1985, the year prior to the adoption of § 9-19-34.1, 190 medical-malpractice cases were filed, only one of which went to verdict. Then again, in 1986, the year the legislature adopted §9-19-34.1, 171 medical-malpractice cases were filed, five of which went to verdict. Finally, in 1999, the most recent year for which statistics are available, 151 medical-malpractice cases were filed, six of which went to verdict. Even assuming that all plaintiffs whose cases were tried also have a collateral source of medical benefits, the number of individuals in the class remains tiny — somewhere in the vicinity of 100 individuals over the course of the 14 years since § 9-19-34.1 was adopted. The plaintiffs contend that § 9-19-34.1
deprives them of their legal right to recover for the same elements of damages-full compensation for the entirety of their reasonable and necessary medical expenses — as other victims of negligence.
Having delineated the contours of the class, the Court's next task is to determine the interest § 9-19-34.1 furthers. The Court need not dally long doing so since the bill by which it was enacted contains a lengthy preamble that reads as follows:
 "WHEREAS, The number of medical and dental malpractice claims being made and the cost of settling such claims by the Medical Malpractice Joint Underwriting Association of Rhode Island, an agency of state government designed to provide a continuing stable institution for medical and dental malpractice liability insurance and the dominant such insurance carrier in this state, has continued to increase significantly; and
 WHEREAS, As a result, the Medical Malpractice Joint Underwriting Association has recently experienced an accelerated negative financial position resulting in a fund deficit as of December 31, 1985; and
 WHEREAS, Insolvency of said Association would have an adverse financial effect upon the citizens of Rhode Island who purchase liability insurance of any type as their premiums would increase in order to offset the deficit or, alternatively, such insolvency would adversely affect all the taxpayers of Rhode Island; and
 WHEREAS, The General Assembly also declares that it is the policy of this state to promote the health and safety of patients in public and private hospitals throughout the state by reducing the incidence of medical and dental malpractice and that the credentialling of physicians and dentists by hospital medical staff committees and otherwise does promote patient health and safety by subjecting physicians and dentists to close scrutiny by their professional peers; and
 WHEREAS, The General Assembly finds that a significant number of medical and dental malpractice claims have been filed against a relatively few health care providers; and
 WHEREAS, The disciplining of the medical and dental profession has been impeded by the lack of a free flow of information due to a fear of civil suit or other consequences to individuals with knowledge of the actions of health care providers; and
 WHEREAS, The General Assembly finds that the potential risk of lawsuits under federal and state antitrust laws presently discourages the thorough and candid evaluation of medical and dental staff privilege applications by physician and dentist peers of such applicants as part of the credentialling process, and that the Board of Medical Review and Board of Examiners in Dentistry are the appropriate agencies of state government to supervise, under the antitrust state action exemption, the granting, denial, renewal, nonrenewable, suspension or removal of hospital medical and dental staff privileges throughout the state; and
 WHEREAS, The General Assembly declares that it is the policy of this state to promote the free flow of information between health care providers and the various peer review and disciplinary organizations in the health care field; and
 WHEREAS, Medical and dental malpractice claims, unlike other tort actions, often are not filed with insurance or health care providers for many years after a cause of action occurs, thereby creating a situation where an unreasonable amount of interest on claims has accrued; and
 WHEREAS, The General Assembly acting within the scope of its police power finds the statutory remedy herein provided is intended to be an adequate and reasonable remedy now and into the foreseeable future[.]" P.L. 1986, ch. 350, preamble.
The legislative purpose behind § 9-19-34.1 is clear notwithstanding that a review of the Act in its entirety shows that only three, or perhaps four, of the whereas clauses are meaningfully related to §9-19-34.1.
In 1986 it was the legislature's perception that absent some exercise of its police powers the JUA, an agency of state government designed to provide a continuing stable institution for medical and dental malpractice liability insurance and the dominant such insurance carrier in the state, risked insolvency and/or the citizens of Rhode Island would feel the adverse financial effect of increased liability insurance premiums needed to offset the JUA's December 31, 1985 fund deficit. In laying out the legislative considerations behind the passage of § 9-19-34.1 and related statutes, the legislature pointed to the adverse impact on all of the Rhode Island taxpayers. The legislative intent was very clearly to stabilize the JUA by reversing its negative financial position and to do so by spreading the losses and risk of loss caused by medical negligence to the other sources of coverage that might be available to victims of medical malpractice.
Just as clearly, the legislative intent was not to require the victim of the medical malpractice to bear the losses caused by the medical negligence or to shoulder any portion of the burden in keeping the JUA solvent. Had that been the case, the obvious remedy would have been for the legislature to impose a cap on damage awards for one or more of those elements of damages that more directly compensate a plaintiff for their losses-for example, pain and suffering, lost earnings or earning capacity, permanent injury or physical incapacity, etc. Instead the legislature opted to spread the cost of keeping the JUA afloat by shifting the cost of the medical-malpractice victim's damages to what are typically other sources of insurance. In effect, the legislature attempted to spread a portion of the risk of medical-malpractice awards to other insurance providers.
However, where the collateral source is Medicare, § 9-19-34.1 is of no value whatsoever in spreading the losses caused to a victim of medical malpractice as was intended by the legislature. In fact, the effect of § 9-19-34.1, when combined with the fact of the federally- created statutory lien running in favor of the Health Care Financing Administration (HCFA), the medical-malpractice victim, unlike the victim of some other form of negligence, is subject to a double loss caused when their Medicare-covered medical expenses are deducted from the damage award while they remain liable to the HCFA's right to enforce its federally-created statutory lien against the award.42 C.F.R. § 411.24 (1999). Furthermore, § 411.24 provides that the HCFA may enforce a federal Medicare lien directly against the party legally liable for the harm caused to the beneficiary of the Medicare payments. Thus where the verdict against a medical professional is reduced by the amounts paid by Medicare, Medicare retains a right of action against both the plaintiff-victim and the defendant medical professional, the latter of which will, of course, turn to the JUA or other liability insurer for coverage. Thus where Medicare is the collateral source, the legislative intent driving § 9-19-34.1 is not only thwarted but the effect is completely contrary to the legislative purpose. See also DiPetrillo v. Dow Chemical Co.,729 A.2d 677, 681 (R.I. 1999) ("Under Article VI, clause 2, of the Supremacy Clause of the United States Constitution, federal law preempts state laws that `interfere with, or are contrary to' federal law.").
Similarly, § 9-19-34.1 is of no value where the collateral source is a private insurer and the plaintiff-victim settles their claim prior to the point where a jury renders its verdict. Up to the point that the jury renders a verdict, the terms of the insurance contract will continue to govern the victim-beneficiary's obligation to reimburse the carrier. It is well known, albeit not as readily ascertained as to specific details of any given insurance contract, that the private insurance provider, just like the state and federal health care agencies, will ordinarily look to the entirety of the settlement proceeds for purposes of enforcing its lien or right to reimbursement. Private or public insurers will typically assert their claim against the totality of the settlement regardless of how the parties might have allocated the proceeds among the different elements of damages. Ultimately, the medical-malpractice victim who receives a settlement from a health-care professional will loose a portion of that settlement to the collateral source of medical benefits. The amount they pay to the insurance carrier will vary and will be largely a function of the degree of success they have at negotiating a compromise of the lien. For those plaintiff-victims whose settlements with the tortfeasor reflect a compromise of medical expenses due to the anticipated operation of the collateral source rule at trial, the effect of § 9-19-34.1 becomes completely contrary to the legislative purpose when the plaintiff-victim becomes caught in the squeeze between their own insurance carrier and the defendant's insurance carrier.
Furthermore, because the number of medical-malpractice cases actually tried is so small, § 9-19-34.1 necessarily has little impact on the JUA's overall costs incurred in defending and providing liability coverage in medical-malpractice cases. It is also well known and easily ascertained that personal-injury or death cases including medical-malpractice cases will not always involve substantial medical expenses-especially when those expenses are compared to the damages caused by permanent injury, pain and suffering, or death. And, while it can be argued that § 9-19-34.1 has an effect on the cases that are settled before trial, it can be argued with equal force that any such effect is speculative at best and of dubious value due to the harm caused to the plaintiff-victim when they compromise the cost of their medical expenses. This pressure-to-settle argument ignores the plain intent of the legislature that the harm caused by medical negligence be spread to the victim's other sources of medical coverage and not to the victim themself. Furthermore, the threat of protracted litigation and the specter of a large damage award based on the other elements of damages are well known to be serious settlement considerations for a defendant in a personal injury cases-a plaintiff's medical expenses are only one component of the many elements of recoverable damages and an even smaller consideration when weighing the overall benefits of settlement.
Finally, as plaintiff points out, it is also generally known and readily ascertained that the number of insurance carriers available to provide professional-negligence coverage to medical providers has increased substantially since 1986 when the legislature perceived a potential crisis to be looming over the JUA. More carriers have entered the competition and the overall risk of loss born by the carriers is shared among a larger pool. Necessarily, whatever impact § 9-19-34.1 might be said to have had on stabilizing the JUA is further diminished. Natural market forces appear to have accomplished what the legislature did not and could not accomplish when it enacted § 9-19-34.1. See generally Boucher v. Sayeed, 459 A.2d 87, 92-93 (R.I. 1983); RI Rules of Evidence Rule 201, Advisory Committee's Note.
Thus, the collateral-source rule of § 9-19-34.1 makes so small a contribution to promoting the stability of the medical-malpractice-liability-insurance industry in Rhode Island, is so ineffective in advancing the legislative purpose, and is in effect so contrary to at least one of the clear legislative objectives, that it cannot be said to be rationally related to the legitimate governmental purpose of snatching the JUA from the jaws of insolvency and promoting the stability of that state agency while yet protecting the victims of medical malpractice from having to directly bear the losses caused by their injuries. Beyond a reasonable doubt there is no rational correlation between precluding a handful of victims from recovering their medical bills and salvaging or sustaining the state insurance agency. Were this part of a broader financial scheme-yet a single component-one might say that while it is one of the less effective measures adopted, the overall thrust of the remedy is rationally related to a legitimate state interest. However, §9-19-34.1 stands alone as the legislative remedy. Even giving the legislature full credit for the perceived crisis and effect that limiting recovery could have on premiums and the agency's insolvency and even allowing that the legislature is not constrained to select the most effective means of accomplishing its purposes, see Town ofLincoln v. City of Pawtucket, 745 A.2d 139, 144 (R.I. 2000) ("[t]he legislative power is plenary, and as long as its chosen method bears a rational relationship to the legitimate end to be achieved, neither municipalities nor individuals may challenge the legislative choice solely on the ground that they could devise a better or more accurate method"), the connection between the legislative concerns driving §9-19-34.1 and the accomplishment of the legislative objectives are so tangential as to be irrational. Furthermore, given the lack of effect that § 9-19-34.1 will have on the liens of state and federal agencies as well as the private contract rights of the medical-malpractice victim's other sources of medical benefits, there are no facts reasonably to be conceived to justify the classification created by §9-19-34.1. Nor are their facts to suggest that to abrogate the statute would potentially restore the conditions that convinced the legislature to adopt § 9-19-34.1 in the first place. Cf. Reid v.Willaims, 964 P.2d 453, 460 (Alaska 1998) ("[w]e must also assume that the statute helped alleviate the conditions perceived by the legislature [when an Alaskan statute comparable to § 9-19-34.1 was adopted]; to abrogate the statute would potentially restore conditions that convinced the legislature to adopt the statute in the first place").
For the foregoing reasons, the plaintiffs' motions to strike the defendants' thirteenth affirmative defenses as unconstitutional are granted.
[1] See generally James J. Watson, Annotation, Validity andConstruction of State Statute Abrogating Collateral Source Rule as toMedical Malpractice Actions, 74 ALR4th 32.
[2] Though not dispositive, see Marran v. Gorman, 359 A.2d 694, 696 n. 4, 116 R.I. 650, 653 n. 4 (1976) ("[d]ecisions of Federal District Courts construing Rhode Island law in the light of certain constitutional principles enunciated by the United States Supreme Court, while not binding on us, are certainly entitled to our respect"), the Court notes that in the course of deciding a motion in limine, Judge Ronald R. Lagueux "formally declared unconstitutional, in violation of the federal constitution[,]" § 9-19-34, the predecessor to the statute in question here. Dorias v. Yu, C.A. No. 90-198, Hearing on Motion In Limine (D.R.I. Oct. 7, 1991).