DECISION
This case is about the health of young children, though at first blush it appears to be about residential landlords chaffing at regulations imposed by the State relative to lead hazard abatement. The issue before the Court can be stated simply: may the legislature, in pursuit of its legitimate and laudable goal to mitigate — if not eliminate — conditions in residential housing units that cause lead paint poisoning in children, impose burdens and responsibilities on some residential apartment lessors, while carving out an exemption from the law's requirements for owner-occupied two and three unit residential buildings? Phrased in the law's jargon, the question presented for consideration in this declaratory judgment action becomes: to reach its goal of lead paint mitigation and a consequent diminuition of lead poisoning in young children, babies and their mothers, did the legislature have a rational basis for exempting from the requirements of the Lead Paint Mitigation Act, as amended, owner-occupied two and three unit buildings while mandating that the owners of all other rental units operate under the law's provisions?
The issue may also be stated in terms of the law's pragmatic implementation: has the legislature discovered among landlords a sub-class so knowledgable about childhood lead poisoning and so altruistic and beneficent toward children and pregnant women that tenants living in owner-occupied two and three unit dwellings may have their health entrusted to this sub-class rather than to a legislative regime administered by health care professionals and the attorney general? And put yet another way: can the legislature delegate to untrained persons outside the scope of government service the implementation of its health policies relative to children under six years of age and pregnant women, while at the same time mandating trained health care professionals and related personnel maintain a statutorily and administratively created regime designed to protect other persons similarly situated?
Plaintiffs in this matter are owners of residential apartment buildings and units subject to the strictures of the Rhode Island Lead Hazard Mitigation Act (the "Act"), as amended. R.I.G.L. 42-128.1-1, et seq. They complain that exceptions afforded by the Act to other categories of rental unit owners offend the equal protection clause of Article I, Section 2 of the Rhode Island Constitution; and they apply to this Court pursuant to R.I.G.L. §9-30-1, et seq., for a declaratory judgment confirming their contention.
For more than a decade, the Rhode Island Legislature has been grappling with the problem of lead paint poisoning in Rhode Island, occasioned by much of this State's rental housing stock pre-dating 1978, the year the use of lead paint in residential dwellings was banned. In 1998 the legislature declared "poisoning from lead paint . . ." to be "a significant housing related [problem] in Rhode Island." R.I.G.L. § 42-128-1(d). Moving from the domain of concern into action and implementation, the legislature in 2002 passed the Lead Hazard Mitigation Act. R.I.G.L. § 42-128.1-1, et seq. The Act was amended in 2005 in a manner that the plaintiff landlords argue is constitutionally defective. In so many words, the plaintiffs say that thought they are required by 42-128.1.8 to attend "lead hazard awareness" classes, to provide tenants with information about the hazards of lead paint and "how to give notice of deteriorating conditions," and to abate lead paint hazards in circumstances delineated by the statute, the leglislature unlawfully exempted ". . . pre- 1978 rental dwelling units that are: . . . comprised of two (2) or three (3) units, one of which is occupied by the property owner. . . ." R.I.G.L. § 42-128.1-8(e)(4). Plaintiffs do not complain of other exemptions found in R.I.G.L. 42-128.1-8(e) such as "temporary housing" or "elderly housing"; but they do advance the additional claim that they are denied the equal protection of the laws because the statute confers a "presumptive compliance" upon owners of ten or more dwelling units who meet certain criteria delineated by the statute. R.I.G.L. 42-128.1-4. The claim of Mr. Mackie and his fellow landlords regarding the owner-occupied two and three unit dwellings has merit; but their contentions about the ten or more dwelling unit buildings does not.[1]
Plaintiff Stephen Mackie and his fellow aggrieved landlords seek a declaratory judgment that the exemption for owner-occupied two and three unit buildings cannot survive rational basis scrutiny under the equal protection clause of Article I, Section2 of the Rhode Island Constitution; and they also requests this Court to enjoin enforcement of the Act by the defendant state officials upon such a declaration. When the Complaint was filed on October 28, 2005, three days prior to the effective date of the Act (November 1, 2005), it was accompanied by an application for temporary injunctive relief. Because of the nature of the constitutional challenge, as well as the wish of the Court to hear fully from both sides, the Court deferred consideration of the application for injunctive relief to December 7, 2005.
Prior to the commencement of the December 7th hearing, it was determined by the Court and counsel in chambers, as well as on the record, that the matter would proceed in two stages: first, the Court would consider the application for a declaratory judgment based upon the plaintiffs' challenge to the facial validity of the problematic exemption found within the statute; and second, if the plaintiffs were successful, any requests for equitable relief would be considered later at a separate hearing. There were several prudential reasons for proceeding this way. If the Court ruled in favor of the plaintiffs on their requests for a declaratory judgment, principles of comity would dictate that the legislators be given an opportunity to revisit the statute and give such consideration as they wish to a decision by this Court. This is an approach often employed in such circumstances;see, e.g. Douglas v. Jeannette, 319 U.S. 157 (1943), the rationale being that a declaration by a court of unconstitutionality may, by and of itself, result in compliance or appropriate adjustments by all concerned, including a legislative body; and the use of equitable powers are not always immediately necessary in "order to secure petitioners' constitutional rights . . .", 319 U.S. at 165.
Also, this method was employed by me in Club 2000 Inc. et alv. State of Rhode Island, et al, NC 2005-0135, a Newport County Superior Court matter in which the exemptions found in the Public Health and Workplace Safety Act, R.I.G.L. § 23-20.10-6 (the anti-smoking law) were violative of the Equal Protection clause of the Rhode Island Constitution; and the legislature, which proceeded to amend the Act in accordance with the Court's declaration of the unconstitutionality of some of its provisions, obviously approved of this approach. Moreover, it is well-established that it is within the discretion of the Court as to whether a declaratory judgment shall be issued in any event, just as the issuance of an injunction is discretionary. And it should be noted that at a future hearing for injunctive relief, the defendants would have defenses available to it (such as clean hands) that do not apply in declaratory judgment actions.
It is beyond cavil that legislative enactments are presumed constitutional; and only if plaintiffs can demonstrate beyond a reasonable doubt that a statute is repugnant to a constitutional provision may a court declare it to be so. As will be explained more fully below, the Plaintiffs have demonstrated that the radically disparate treatment of different classes of landlord by the Legislature in the Lead Hazard Mitigation Act is without any rational basis ordained to achieve the statute's clear purpose, namely, the reduction, if not elimination, of lead paint poisoning in children and their mothers. The Defendants' stated justification for exempting owner-occupied two and three-dwelling units from the law's requirements was that these owners, as distinguished from the landlords of all other residential units, will take it upon themselves to protect children in their buildings from lead paint poisoning. As the respiratory, circulatory and nervous systems of the children living in two and three-decker buildings are no different from those of children living in more capacious structures, state officials must direct the Court's attention to something more substantial than a belief in the altruism and good will of the exempted class of landlords to justify the legislative distinction.
The Supreme Court of Rhode Island has favored us with a succinct discourse on equal protection analysis. In a matter involving an alleged medical malpractice crisis that motivated our Legislature to treat malpractice plaintiffs different from persons complaining of injuries sustained at the hands of people other than physicians, our Supreme Court said: "The critical question is whether there exists an appropriate governmental interest suitably furthered by the differential treatment."Boucher v. Sayeed, 459 A.2d 87, 91 (R.I. 1983) (citing PoliceDept. of Chicago v. Mosley, 408 U.S. 92, 95 (1972)). TheBoucher Court discussed the well-known distinction between strict scrutiny and rational basis scrutiny:
 Strict scrutiny is applied when a statute's differential treatment of a select class of persons either infringes upon fundamental rights [such as the right to marry or the right to travel] or results in the creation of a suspect classification [such as alienage or race] (citations omitted). Such discrimination can only be justified by a compelling state interest. On the other hand, minimal scrutiny is generally applied to economic and social regulation. Under this standard, the court merely determines whether the differential treatment bears a reasonable or rational relationship to a legitimate state interest. Boucher, supra, at 91 (emphasis supplied).
Intermediate scrutiny, existing somewhere between the two categories just referenced, is employed in matters involving classifications based on gender, but that clearly does not apply in this case. See Kleczek v. R.I. Interscholastic League,Inc., 612 A. 2d 734, 737 (R.I. 1992).[2]
When a challenge to the facial validity of a legislative classification is mounted on equal protection grounds, an evidentiary hearing is not necessarily required.[3] In other words, the state officials defending a statute not need build a record with empirical data but may rely on a rational or "plausible justification" for the classification. Moreover, as the Supreme Court observed in Boucher: "It has been long established that courts may uphold the constitutionality of legislation in the face of an equal-protection challenge by taking judicial notice of generally known or easily ascertainable facts," Boucher, supra, at 92; and conversely, "a party challenging the legislative judgment may attack its constitutionality by bringing to the court's attention any facts that the court can judicially notice to support the proposition that the legislative judgment is without rational basis." Id.
The Boucher Court went on to say that it was also "appropriate for us to consult whatever extrinsic sources of information are available, such as proceedings of the Constitutional Convention itself, and legislation, if any is available, relating to the constitutional provision in question." Id.
In the instant matter, this Court suggested that it could take judicial notice of the fact that the lungs and physical attributes of a child under six years of age living in a two or three-unit building where the owner also resided on the premises were no different than the lungs and physical attributes of a child under six residing in a more capacious building with the owner off the premises. The State, through the Office of the Attorney General, objected to this, claiming that somehow the presence of a titled owner living in a two or three-unit building would significantly decrease the risk of lead poisoning for young children and pregnant women living on the premises. The State was afforded the opportunity to support its contention, but the one witness it presented, Dr. Patricia Nolan, the former Director of the Rhode Island Department of Health, confirmed what the Court had judicially noted.
On the last day of her testimony, Dr. Nolan was pointedly asked:
 If you can imagine a building with three units in it, three rental units, and another building with, say, five units in it, forgetting any other factors other than the fact that each of those units is covered with lead paint and the units are occupied by families that have children under six years of age, is there any reason to conclude that the child in the three unit is any more likely than the child in the five-unit building to get lead poisoning?
 . . . .
Dr. Nolan responded:
 In any given unit the child has about the same opportunity to be poisoned under the circumstances that you described. So, the fact that you have more units in one building than in other means that you have more opportunities for children to be poisoned. (Tr. 4, December 14, 2005.)
Plaintiffs' counsel, in a follow-up question, was able to obtain a clarification from Dr. Nolan. He asked: "I believe I heard you say, Doctor, that in any given building the more units you have, the more chances there are for a child to be poisoned?". . . . Dr. Nolan responded:
 What I was saying is that the child who lives in each unit presumably has the same opportunity to be poisoned, if you can call it an opportunity. So, if you have more units and there are children living in each unit, there are more opportunities for a child to be poisoned in the building but each individual unit I think would be basically similar." (Tr. 5, December 14, 2005.)
At several points during her testimony, Dr. Nolan opined that even one child at risk is one too many. The State argues, and Dr. Nolan suggests from what she acknowledged were incomplete surveys and statistics, that landlords who live in two and three-unit buildings are more likely to maintain their properties in a relatively safe fashion viz a viz lead paint hazards than are the owners of other buildings, apparently even when the owner lives on the premises. This anecdotal and baseless proposition apparently escaped members of Congress when they enacted the Residential Lead-based Paint Hazard Reduction Act of 1992,42 USC 4851, et seq. In that legislation, which had as a purpose "to develop a national strategy to build the infrastructure to eliminate lead-based paint hazards in all housing as expeditiously as possible," (42 USC 4851 a (1), no exemption for owner-occupied dwellings of any size can be found. Indeed, although the federal legislation exempted housing for the elderly, it effectively cancelled such an exemption if a child under the age of six resided in elderly housing. 42 USC 4851, 27
b. Thus, it appears that the exemption for owner-occupied two and three unit dwellings is offensive to the "national strategy" designed to eliminate lead poisoning in children. The federal courts are surely equipped to declare authoritatively on this point, and there is no need for this Court to embark upon an excursion into the area of federal pre-emption, when the distinction selected by our legislature cannot pass rational basis scrutiny.
While under no obligation to do so, the Defendants submitted evidence designed to bolster their contention that it is rational to assume that owners who occupy one of the units in their two or three-unit buildings will be more likely than absentee landlords to protect children from the ravages of lead poisoning; and it is therefore rational — the State argues — to exempt two and three unit owner-occupied dwelling from the purview of the statute. This contention is subverted by the very information to which the State directed the Court's attention. Dr. Nolan, a moving force behind the State's efforts to address this problem, testified that childhood lead poisoning is "a very severe problem and a very significant problem for child health," (Tr. 23, December 7, 2005) and she agreed with the statement that "childhood lead poisoning in Rhode Island is the number one environmental health hazard." (Tr. 23, December 7, 2005.) She also declared that "the beneficiaries of this legislation are clearly the children." (Tr. 28, December 7, 2005.)
From the testimony of Dr. Nolan, and from all other evidence, as well as argument made to the Court, there is no reason to conclude that owners of two and three-unit buildings will protect the health of their child and pregnant women tenants with such zeal and such efficiency that they do not require the same legislative stimulus to maintain their property as do owners of non-exempted rental units. As to the industriousness of the owner-occupied two and three-unit buildings, Dr. Nolan testified: "We don't have studies per se, but we do have the experience of case managers and the lead inspectors. It is certainly not 100%, but there is a strong sense that there is on the whole a better response." (Tr. 34, December 7, 2005.)
What do these lead inspectors say? In an affidavit (Ex. J.) Eben Dowell, an Urban Information Specialist with The Providence Plan, wrote, in pertinent part:
 For multi-family properties in Providence where at least 1 child tested with a blood lead level of 10 micrograms per deciliter or higher (approx. 2408 properties) 59% did NOT have an owner-occupant. More pronounced, the rate of NON-owner occupancy for multi-family properties was 63% where at least 2 children tested at this level and 69% where at least 3 children tested at this level.
 For multi-family properties in Providence where at least 1 child tested with a blood lead level of 20 micrograms per deciliter or higher (approx. 611 properties) 63% did NOT have an owner-occupant. (Emphasis in original.)
Logically, Mr. Dowell's figures lead to the conclusion that where one child tested with a blood lead level of 10 micrograms per deciliter, 41% of the multifamily properties had an owner-occupant; and where at least one child showed a lead level of 20 micrograms per deciliter, 37% of the properties were occupied by the owner.
The State also submitted the affidavit of Kimberly C. Booth, a Healthcare Consultant who performs services for the Lead Clinic at St. Joseph's Hospital in Providence. She wrote that "of all the poisoned children treated at the Lead Clinic for whom landlord information was known, 52% lived in absentee-owned multi-family units versus 34% in owner-occupied multi-family dwellings; the remaining 14% are single-family absentee-owned and owner occupied dwellings." We cannot tell from Ms. Booth's figures how many units were in the multi-family buildings to which she refers; but her data is not appreciably different from that of Mr. Dowell. If 52% of the lead poison children live in absentee-owner multi-family units, we can assume that more than 34% live in owner-occupied dwellings. We know the figure is greater than 34% because of Ms. Booth's declaration that 14% of the poisoned children treated at the Lead Clinic live in "single-family absentee-owner and owner-occupied" units. (emphasis supplied).
So whether 34% of the children poisoned by lead are coming from owner-occupied buildings — or whether 44% of them are coming from such locations — the numbers do not in any way show that owners of two and three-unit buildings who themselves live on the premises have significantly mitigated the hazards of lead for their tenants, nor is there any likelihood they will do so in the future without an impetus from the legislation.
To its responsive pleadings, the State attached as Exhibit F the affidavit of Liz Colon, an advocate for the Childhood Lead Action Project. Ms. Colon declares that in Rhode Island "approximately 100 children [are] needlessly poisoned each month." This means that at a minimum 35 of these children are poisoned in a two or three-unit tenement building, one of whose units is occupied by the owner.
An earlier legislative attempt to define a morally superior class of individuals was found to be unconstitutional on equal protection grounds in Pogany v. Medeiros, 847 F. Supp. 10
(D.R.I. 1994). In that matter, the Rhode Island legislature, in an effort to promote fairness and eliminate corruption during elections, determined that no state or municipal employee should serve as an election official; but, for reasons best known to itself, the legislature exempted from this prohibition public school employees and persons residing in Westerly, Rhode Island. In declaring the statutory exception for school teachers and Westerly residents to be unconstitutional, the United States District Court relied on the Fourteenth Amendment to the United States Constitution, but the analysis is apposite for considerations under Article I, Section 2:
 . . . there is no evidence that residents of Westerly are immune to the same political pressures faced by public employees residing in other areas of the State. The Court can find no rational reasons for these exclusions in light of the clear purpose of the statute. Therefore, the statute unreasonably discriminates against plaintiff and thus violates the equal protection clause of the Fourteenth Amendment. 847 F. Supp at 12.
The insistence by defendants that owners of two and three unit buildings who happen to live on the premises are morally superior and technically advanced when compared to owners of other residential units calls to mind the insightful observation of Mr. Justice Frankfurter: "And there comes a point where this Court should not be ignorant as judges of what we know as men." Wattsv. Indiana, 338 U.S. 49, 52 (1948). (Undoubtedly, were Mr. Justice Frankfurter writing today, he would conclude his remark with the words "or women.") The point to be made is that these landlords who are favored by the exemption cannot claim any great success as a class in protecting the health of young children and pregnant women when 35% of the people continuing to be poisoned by lead paint come from dwellings they own. Just as the school teachers and Westerly residents in Podgany were no different morally from people employed by municipalities or the State as secretaries or janitors, the people who reside in two and three deckers they happen to own are no different morally from owners who live in a four unit building or absentee owners who own a three unit building — or any other category of landlord.
In addition to their contention about the beneficent proclivities of owners who live in two and three unit buildings, the defendant officials and amici curiae raise three other arguments they say were a plausible justification for the legislative discrimination present in this matter. First, they point to the Rhode Island Fair Housing Practices Act, R.I.G.L. §34-37-1 et. seq.; second, they suggest that the legislature omitted placing the owner-occupied two and three unit dwellings under the Act's requirements because of a desire to preserve affordable housing for people with children under six years of age; and third, they contend that the recent First Circuit decision in Medeiros v. Vincent, 431 F.3d 25 (D.R.I. 2005) should serve as a template for equal protection analysis. It is the opinion of this Court that these arguments are wide of the mark relative to the purpose of the legislation under examination here — the health of children — and are therefore unavailing to the defendants' contentions that the discriminatory approach adopted by the legislature is constitutionally permitted.
The Rhode Island Fair Housing Practices Act does indeed provide a few narrow exemptions from its general and clearly articulated prohibition of discrimination in residential housing on the basis of a number of personal characteristics, e.g., "race" "religion" "sexual orientation" "marital status" "age" "familial status", etc. R.I.G.L. 34-37-4(a). For instance, the owner of a two unit building who occupies one of the units need not rent to a family or individual with children, R.I.G.L. 34-37-4.1(a)(1), if the building houses four or less units, and the owner "actually maintains and occupies one of those living quarters" and "one of those units is already occupied by a senior citizen or infirmed person for whom the presence of children would constitute a demonstrated hardship," R.I.G.L. 34-37-4.1(a)(2). Additionally, an owner who lives in a building with three or fewer units need not rent to a person if the owner is offended by the potential renter's sexual orientation. R.I.G.L. 34-37-4.4. Nothing in the Rhode Island Fair Housing Practices Act exposes renters or potential renters to health hazards, and nothing in the Fair Housing Practices Act requires landlords to undertake any affirmative duties regarding a legislatively-designated health hazard while exempting one discrete category of landlords from eliminating a condition clearly hazardous to its tenants.
As to the defendants' contention that the legislature seeks to preserve affordable housing for individuals and families with children under the age of six — or for pregnant women — there is nothing in the express language of the Act to suggest this. Moreover, we must presume that the legislature acting in 2005 knew that it had already placed into Rhode Island's law books The Affordable Housing Preservation Act of 1988, R.I.G.L. 34-45-1, et. seq.; and that more recently it had amended zoning laws to facilitate the development of affordable housing complexes in the cities and towns of this State, R.I.G.L. 45-53.4. This Court cannot presume that the legislature would act to bring about an absurd result, nor can it presume that the legislature would act in a way that would give families, poor or otherwise, the cruel Hobson's choice between living in a dangerous lead-infested environment, and living on the street or in a shelter. In sum, the legislature has clearly articulated its concern about Rhode Island's affordable housing shortage and has addressed it in statutory enactments other than the Lead Hazard Mitigation Act.
Lastly, as to the case of Medeiros v. Vincent, the issue presented to the United States Court of Appeals First Circuit was whether the federal government could properly discriminate between lobster fishermen who utilized traps and those who utilized nets dragged by trawlers along the bottom to catch lobsters. The appellate tribunal carefully described the qualitative differences between these two methods of catching lobsters and saw that the distinction employed by the government was rationally related to the objective of preserving the lobster stock in the North Atlantic, 431 F.3d, at 30-31. Even someone who had never left Kansas could understand that trapping lobster is substantially different than trawling for them.
Simply stated, there is no rational basis for allowing the children who live in these two and three-unit owner-occupied buildings to be at risk while children living in other units enjoy the protection of the Lead Hazard Mitigation Act. "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." Cleburne v. Cleburne Living Center,473 U.S. 432, 446 (1985). Put succinctly, "The . . . sovereign . . . must govern impartially." Hampton v. Mow Sun Wong,426 U.S. 88, 100 (1976). The children in the owner-occupied two and three-deckers cannot be left to the tender mercies of the building owners while children in other apartments enjoy the salubrious benefits of this remedial legislation. Nor may the Plaintiffs lawfully be regulated and financially burdened by the Lead Hazard Mitigation Act while other owners of investment property are exempted simply because of the capacity of their buildings and the residence of the title-holder. The exemption created in R.I.G.L. 42-128.1-8(e)(4) for owner-occupied two and three unit apartment dwellings violates the requirements of the equal protection clause of the Rhode Island Constitution.
At this time, the Court will not enjoin the defendants from enforcing the provisions of the Lead Paint Mitigation Act. It is the hope of this Court that the legislators will promptly re-visit the legislation and remedy the statute's constitutional defects discussed in this Decision. After the legislature has had an opportunity to consider the matter, the plaintiffs may repair to this Court for equitable relief if they deem it to be necessary.
[1] The most obvious observation about landlords who own ten or more dwelling units is that they are not exempt from complying with the duties imposed on landlords by the Act. Indeed, such owners as are entitled to "presumptive compliance" must have virtually unblemished records relative to the maintenance of their properties — "there are no major outstanding minimum housing violations on the premises . . . the property owner has not history of repeated lead poisonings". R.I.G.L. 42-128.1.4-7 (iii) (B-C). Also the owner seeking presumptive compliance must have independent clearance inspections "conducted on at least five (5%) per cent of the dwelling units, but not less than two (2) dwelling units in at least ninety (90%) percent of the independent clearing inspections were passed." R.I.G.L. 42-128.1-4(7)(iii)(D). While people may, in good faith, differ as to whether the figures of five percent and ninety percent chosen by the legislature are the most efficacious, it is clearly within the legislature's prerogative to select enforcement mechanisms based upon what can only be presumed to be the legislature's knowledge about the State's budgetary and personnel resources.
[2] Were this Court to judicially note — as I believe it could do — that the majority of people living in two and three-deckers throughout this state are living at or below the federal poverty guideline and are disproportionately members of ethnic and racial minorities, strict scrutiny could possibly be employed though no reference is made in the statute to race. I decline to take such notice, however, because the classification does not come close to meeting even the lower standard of rational relationship or rational basis. Also, quaere: should strict scrutiny be employed here because the legislature has announced that "[p]regnant women and families with children under six (6) years of age shall be deemed to have a right to housing in which lead hazards have been mitigated or abated?" 42.128.1-10(a) (emphasis supplied).
[3] Here, the plaintiffs seek a judgment declaring that the statute, as written, is violative of our State Constitution's Equal Protection Clause. A court called upon to construe coverage under an insurance contract may have to determine whether a person claiming protection was or was not a resident of a particular household; or in a boundary dispute, the court, before issuing a declaratory judgment, must often hear contested testimony about who was exercising what type of control over a disputed parcel of land. This is not the case here, where the question is whether the defendants can point to a rational basis for the legislative exemption. Indeed, the parties agreed to the submission of all the documents and memos they thought should be full exhibits to be considered by the Court. They differ, of course, as to the inferences to be drawn.